Mahmood ALJASSIM, Mishari Aljassim and Sadoun Aljassim d/b/a Mahmood Aljassim & Brothers
and
Antar Industries, Inc., Plaintiffs,
v.
SS SOUTH STAR (formerly SS Dona Gisella) her engines, apparel, tackle and furniture, In rem
and
General Navigation Trading Co., S. A. c/o Chandris Shipping U. S. A., Inc.
and
American Oriental Navigation Corporation, Defendants.

No. 67 Civ. 1525.

United States District Court,
S. D. New York.

Feb. 18, 1971.

Mudge, Rose, Guthrie & Alexander, New York City, for plaintiffs; Ronnie A. Yoder, Washington, D. C., of counsel.

Zock, Petrie, Sheneman & Reid, New York City, for General Navigation Trading Co., S. A.; Philip J. Curtin, New York City, of counsel.

## OPINION

COOPER, District Judge.

Default against defendant General Navigation and Trading Co., S. A. (General) was entered by Judge Wyatt on June 28, 1968 upon motion pursuant to Rule 37(d), F.R.Civ.P. brought on by plaintiffs Mahmood, Mishari and Sadoun Aljassim d/b/a Mahmood Aljassim & Brothers (Aljassim) and Antar Industries, Inc. (Antar), following General's willful failure without excuse to answer written interrogatories propounded by plaintiffs.[1]

This opinion [2] constitutes our findings of fact and conclusions of law pursuant to Rule to an inquest held before us (following Judge Wyatt's order) throughout the entire course of which defendant actively participated through his legal representative.

### Facts

Aljassim maintains a place of business in Kuwait as the exclusive retail sales outlet there for Antar Air Conditioners (Complaint para. 2, hereinafter "Compl., para. ——").[3] Plaintiff Antar is a New

---

1. Default against co-defendant American Oriental Navigation Corporation (American) was entered pursuant to a stipulation of the parties signed by Judge MacMahon on January 9, 1970 providing for the entry of judgment against American without further notice "in the amount determined by the Court as damages (less any amount awarded as punitive damages against defendant General Navigation) in the inquest to be held with respect to defendant General Navigation Trading Co., S.A."

2. The directive of our Circuit to give primary attention to criminal matters accounts for the somewhat belated disposition of this proceeding.

3. The admission of factual allegations in the complaint by reason of General's default is discussed, *infra*.

York corporation (Compl. para. 3) which sells its air conditioners and other appliances under its brand name in Kuwait and eight-five (85) other countries (Transcript, p. 17, hereinafter "Tr. p. ____").

With Aljassim as exclusive dealer, Antar first tendered air conditioners to the Kuwait government in 1954 and to the Kuwait public in 1960 (Tr. pp. 17–19, 64, 67). As Antar's exclusive dealer in Kuwait, Antar's sales in Kuwait were directly tied to Aljassim's sales on a 1–1 basis (Tr. pp. 66, 208–210), with Antar the leader among all brands of air conditioners sold in Kuwait from 1960–1965 (Tr. p. 234).

Due to temperature fluctuations from an average maximum of 99° F. in the shade in April to approximately 120° F. in June (Exhibit 6 hereinafter "Ex. ____"), the Kuwait air conditioner market is seasonal. (Tr. pp. 27, 28, 73, 75–79, 85). It was therefore the practice of Aljassim to order air conditioners each year for delivery in advance of the peak season during May–June (Tr. p. 76).

Accordingly, Aljassim ordered 2,000 air conditioners and spare parts from Antar to be delivered for sale in 1966, the order being placed in November, 1965 (Ex. 7, Tr. pp. 29, 86). Part of this order, 1874 units and 11 boxes of spare parts, was booked by Antar for shipment on the SS DONA GISELLA through Antar's booking agent, American Union Transport (Ex. 10; Tr., pp. 34–35; 53–54). The booking was effected on January 14, 1966 with defendant American (not to be confused with Antar's agent American Union Transport), the time charterer of the vessel, and constituted a contract of affreightment between Antar and American (Compl., para. 8). Under that contract American was obligated to deliver the cargo to Aljassim, the consignee, in accordance with the terms of the booking

note (Ex. 10, Tr., pp. 54–55) and the bill of lading subsequently issued on February 19, 1966 by defendant General (Compl., para. 8), the owner and operator of the vessel (Compl., para. 5).[4] General had time-chartered the vessel to American on December 24, 1965, for a period of three to five months at charterer's option (Compl., para. 7). Under the terms of the charter, General was to furnish the captain and crew and operate the vessel; the charter was not to be construed as a demise of the vessel (Compl., para. 7). The charter also provided that the captain was to sign bills of lading for cargo carried on the vessel (Compl., para. 7).

In accordance with the booking note which constituted the underlying contract of affreightment with American, on or about February 19, 1966 Antar delivered the cargo to the vessel in Baltimore in good order and condition. In consideration of an agreed freight duly prepaid, defendant American agreed to transport the cargo to Kuwait and deliver it in like good order and condition as when shipped to the consignee Aljassim (Compl., para. 8) in accordance with the conditions of a bill of lading duly issued and signed for the master of the vessel SS DONA GISELLA on behalf of defendant General, its owner. General's issuance of the bill of lading created a contract between it and the plaintiffs (Defendant's pre-trial brief, p. 13); the plaintiffs duly complied with all the terms of the contract of affreightment (Compl., para. 14) between Antar and American.

Aljassim grew concerned when the departed vessel had not arrived in Kuwait by April 15, 1966 (Tr. pp. 41ff., 89). Following their request (Tr. pp. 47, 88), Antar advised Aljassim that American (through its agent) revealed that the vessel was leaving (or had left) Jeddah, Saudi Arabia on or about April 15, 1966 and the estimated time of arrival in Ku-

---

4. General is a Panamanian corporation doing business in New York through its general agent Chandris Shipping U.S.A., Inc., which maintains a place of business in New York, N. Y. (Compl., para. 4).

wait was April 22, 1966 (Ex. 11, 12; Tr., pp. 38–40, 88).

The cargo did not arrive on April 22, 1966; in fact, the vessel never arrived in Kuwait (Tr., pp. 42, 89). In the course of the voyage from Baltimore to Kuwait defendant General repossessed the vessel in Aden from American. Without notice to plaintiffs General ordered the vessel to deviate from the voyage to Kuwait. The cargo was damaged after discharge in Aden (Compl., para. 9), with notice of discharge being given on May 9, 1966 and only after inquiry from Antar as to the disposition of the goods. General's agent Chandris England, Ltd. notified Antar by cable that the discharged goods could be obtained only upon payment by the consignee of all charges for discharging, storage, delivery to an oncarrying ship, and production of the original bill of lading (Ex. 15; Tr., pp. 48–50).

Antar immediately advised Aljassim of the abandonment of the goods (Tr., p. 51); Aljassim promptly sought to obtain transshipment to Kuwait on the first available steamer (Ex. 22, Tr., p. 101), and at their own expense arranged for the transportation from Aden[5] of the cargo (Compl., para. 11). It arrived in Kuwait on June 18, 1966 (Ex. 25, Tr. p. 105), approximately two months after the estimated time of arrival.

*Effect of General's default*

■ By reason of its willful failure to answer interrogatories[6] and by the default entered against it pursuant to Rule 37(d), F.R.Civ.P.,[7] General has admitted the well-pleaded[8] allegations of the complaint. Such well-pleaded allega-tions may not now be contested. Trans World Airlines, Inc. v. Hughes, 308 F. Supp. 679, 682–683 (S.D.N.Y. 1969); Trans World Airlines v. Hughes, 38 F.R. D. 499 (S.D.N.Y. 1965); Thomson v. Wooster, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885).

### I. *The contract claim*

By defendant General's default, it is taken as true that the cargo was loaded in Baltimore "pursuant to a contract of affreightment" whereby American agreed to carry the cargo to the consignee Aljassim in Kuwait in accordance with a pre-paid bill of lading issued to Antar by General (Compl., paras. 2, 8). These allegations and their reasonable inferences, *Hughes* (1965), supra, showed contracts with American (the booking note supplemented by the bill of lading) and General (the bill of lading).

■■ The contract evidenced by the bill of lading issued by the master of the ship chartered but not demised is the contract of the ship, the charterer who caused their issue, and that of the owner whose master as authorized agent issued them. Gans S. S. Line v. Wilhelmsen, 275 F. 254, 262–263 (2d Cir. 1921), cert. denied sub nom. Barber & Co. v. Wilhelmsen, 257 U.S. 655, 42 S.Ct. 97, 66 L.Ed. 419 (1921). Nondelivery of the cargo was a breach of the contracts as to both American and General and plaintiffs may proceed against both American and General in contract. Compl., para. 9; *Gans*, supra; The Capitaine Faure, 10 F.2d 950 (2d Cir. 1926); Carver, Carriage of Goods by Sea, (11th Ed. 1963), para. 57; defendant's post-trial brief, pp. 7–8.

---

5. Prior to the discharge at Aden, plaintiff-consignees Aljassim became for value the owners and holders of the bill of lading issued at Baltimore and were entitled to delivery of the cargo (Compl., para. 10).

6. General does not place at issue service, notice, or opportunity to defend or answer.

7. See 4 Moore's Federal Practice [2.–5], n. 14, at 37–72.

8. This is not a case where allegations were rendered indefinite or erroneous by other statements in the complaint, contrary to facts of which the Court took judicial notice, not susceptible of proof by legitimate evidence, or contrary to uncontroverted material in the case file. *Hughes*, 1965, infra. See Complaint, Ex. 10, and discussion of superseding and merger of the booking note, infra.

*Damages resulting from broken contract*

The foreseeable damages flowing from the breaches include:

1. transportation expenses $21,260.99

General's Pre-Trial Brief, p. 14, concedes liability for freight charges incurred by Aljassim in carrying the cargo from Aden to Kuwait. The Hellenic Lines bill of lading (Ex. 31) paid by Aljassim (Tr., p. 117) shows the cost of such transshipment was $21,260.99.

2. additional insurance costs $ 4,424.00

■ Aljassim was obliged to pay additional insurance premiums covering the second voyage (Tr., p. 119) and the age of the vessel (Ex. 32, Tr., p. 120) which at the stipulated exchange rate (Ex. 33— $2.80 per KD) total $4,424.00. This item is recoverable as "necessary expenses incurred in connection with such reshipment." The Capitaine Faure, 10 F.2d at 969.

3. expenses at Aden $12,879.54

■ The Liverato Invoice (Ex. 30, Tr., pp. 114–15), the Behbehani credit note (Ex. 45) and the Aljassim check showing payment of KD 4,599.834 for the Liverato bill (Tr., pp. 239–41) establish this item of damages in the amount of $12,879.54.

4. destroyed and missing parts $ 7,566.47

The following damages were incurred for destroyed and missing parts (Exs. 7, 27, 35; Tr., pp. 29, 33, 106–07, 109, 137–139) totalling $7,566.47.

*Destroyed*

| | |
|---|---|
| 6 air conditioners completely damaged (KC 1556) @ $206.17 | $1,237.02 |
| 330 Front panels @ $9.90 | 3,267.00 |
| 314 Filters @ $1.15 | 361.10 |
| 75 Switches @ $1.25 | 93.75 |
| 12 Evaporator blowers @ $2.30 | 27.60 |

*Missing*

| | |
|---|---|
| 2,000 Installation kits @ $1.29 | $2,580.00 |

| | |
|---|---|
| Total destroyed: | $4,986.47 |
| Total missing: | 2,580.00 |
| | $7,566.47 [9] |

5. repairs to units $ 3,539.76

Many units required repairs before they could be sold. The Almontaz Garage bill of KD 1264.200 ($3,539.76) establishes this item (Tr., pp. 110–12).

6. lost profits and diminished value of late delivered units

| | |
|---|---|
| Aljassim Brothers | $73,977.66 |
| Antar | 0 |

We find that Aljassim lost 1002 sales between April 22, 1966 and June 18, 1966 (Tr., p. 130). Unfilled orders numbering 502 were recorded on the list of orders kept by Omar Abdullah (Ex. 34), Aljassim's assistant to the chief accountant, for the period through May 14, 1966. Additionally, 500 sales were lost during the period May 14–June 18, 1966 (Tr., p. 129). Aljassim's loss of profit per sale was $73.83 (Ex. 35, Tr., pp. 139–40); therefore its loss of profit in 1966 due to General's conduct was $73,977.66.

Antar, however, suffered no loss with respect to the 1002 sales for 1966. Antar sold 2000 units to Aljassim Brothers in 1966 of which 1874 were shipped aboard the DONA GISELLA (Tr., pp. 29, 30, 31). Antar's price to Aljassim was $196.00 per unit (Ex. 8, Tr., p. 32). Aljassim paid Antar in full (Tr., p. 37). The invoice price paid by Aljassim included a unit profit to Antar of $28.17 (Ex. 39).

Therefore Antar having already been paid, suffered no damages with respect to the 1002 sales.

7. diminished value $28,056.00

Aljassim is also entitled to recover 10% depreciation for each of the 1,002 units which could not be sold in 1966 and had to be held over for sale in later years. Had the events in question not occurred, Aljassim would have had profits from sales of 1,002 units in 1966, with 1,002 fewer inventory items in 1967.

Testimony was adduced from which we find that the Kuwait public demanded new air conditioners. Serial numbers indicate annual model changes even in years where the changes were insubstan-

9. General has made no showing that the damage and loss did not result from its

acts. *The Poznan, infra,* 276 F. at 431–432.

tial.[10] A much smaller, separate market exists for old air conditioners priced at a 10% discount from the previous year (Tr., p. 163ff.).

The 1002 items added to inventory therefore would have depreciated 10% from 1966–1967. Accordingly, Aljassin is entitled to $280.00 per unit x 1002 x 10%, or $28,056.[11]

Aljassim is *not* recovering 110% of its profits for machines which would have been sold in 1966 but for the breach of contract and tort. It is allowed recovery of profits lost for the sales it would have made in 1966 plus 10% diminution in value for machines necessarily held over. This element of damage is to make the aggrieved party whole and clearly is not unjust enrichment.

## II. *The tort claim*

■ The tort of interference with contract is described in Hornstein v. Podwitz, 254 N.Y. 443, 448, 173 N.E. 674, 675 (N.Y.C.A.1930):

"[O]ne who, having knowledge of an existing valid contract between others, intentionally, knowingly, and without reasonable justification or excuse, induces one of the parties to the contract to breach it to the damage of the other party, is liable in an action to recover the damages suffered. The action is predicated on the intentional interference without justification with contractual rights, with knowledge thereof. Such interference constitutes a legal wrong, and, if damages result therefrom, a valid cause of action exists therefor." [12] (173 N.E. at 675).

The allegations of the Complaint establish upon the default:

(1) A valid contract existed between plaintiffs and American (Compl., paras. 8, 10 and 15);

(2) General knew of the contract (Compl., para. 16);

(3) General wrongfully and willfully breached the contract (Compl., para. 16), and

(4) damages resulted (Compl., paras. 17, 18).

■ Under *Hornstein,* the tort here was established.

In *The Poznan,* 276 F. 418 (S.D.N.Y. 1921), Judge Learned Hand held that the owner of a vessel (General) was liable in tort for interfering with a contract of carriage between the charterer of a vessel (American) and a shipper (Antar). Judge Hand put it plainly:

"[T]he libelants insist that the Polish Company [vessel owner—General] is liable in tort, which is said to rest upon compelling the Acme Company [charterer—American] to break its contracts with the libelants at the time the ship was ordered home. The final order to the master to return came from Nevelson in New York [agent of vessel owner] after he had exhausted all efforts he thought desirable to find berths in Havana. No inducements or persuasion was directed to the Acme at all; the order ignored the charterer, though given with its assent, or at least without its dissent. Now it is well settled law in federal courts that where a third party procures an obligor to break a contract,

---

10. There were substantial model changes in the 1966 model but no substantial changes from 1960–1965 (Tr., pp. 163–164). Buyers therefore wanted new post-1965 models due to changes in design as well as serial number and age.

11. There is no claim by plaintiffs for any further depreciation beyond one year.

12. "Malice" is an element of the tort only to the extent that "the intentional doing of a wrongful act without legal or social justification" is malicious; "malice" in this context does not require "actual malice or ill will." Campbell v. Gates, 236 N.Y. 457, 460, 141 N.E. 914, 915 (N.Y. C.A.1923) ; Hornstein, *supra* 254 N.Y. at 675, 173 N.E. 674.

he commits a tort against the obligee. (citations omitted) \* \* \* Under the facts at bar the Polish Company did commit a tort in directing the master to deviate and return to New York. Indeed it was they who primarily broke the contract, the Acme Company was nearly, if not quite, a silent and helpless dummy. I cannot see how the rule could be more aptly illustrated than in such a case." 276 F. at 433.

We find there existed a contract of affreightment between Antar and American to deliver the cargo to consignee Aljassim by reason of the booking note (Ex. 10; Tr., pp. 33–5, 53–4), a contract which existed prior to the issuance of the bill of lading (Compl., para. 8),[13] which not only elaborated the terms of the initial contract but also created an additional contract with General.

■■ Moreover, we find no merger or superseding of the bill of lading and the booking note to create one contract as urged by defendants. The bill of lading (and the integration clause) were not introduced into evidence; facts admitted in answers to interrogatories must be proven, Electric Furnace Co. v. Fire Ass'n of Philadelphia, 9 F.R.D. 741, 743 (N.D.Ohio 1949); and the defenses on the bill are unavailable due to General's abandonment of the voyage. *The Poznan, supra,* 276 F. 430–431. See also Poor, Charter Parties & Ocean Bills of Lading (5th Ed., 1968), § 59; Carver, Carriage By Sea, (11th Ed., 1963), para. 62.

In essence and effect, defendants argue that the rule "Where a third party procures an obligor to break a contract, he commits a tort against the obligee" (*The Poznan, supra,* 276 F. at 433) runs only against "third parties" who are extraneous to the contract and by finding a single contract here there can be no interference. Defendants contend only one contract existed either evidenced by the bill of lading alone or that the booking note merged with the bill of lading by the bill's express terms. Therefore, they maintain, no tort liability can exist because General can never be liable in tort for interfering with its "own" contract.

Cuker Industries, Inc. v. William L. Crow Constr. Co., 6 A.D.2d 415, 178 N.Y.S.2d 777 (1st Dept. 1958) holds that one party to a contract cannot be liable to the only other party to the contract in tort simply by breaching his contract with that same party. It is inapplicable here. There was no "third party" to the contract in *Cuker.* The Court noted that an action could lie against extraneous joint venturers for inducing defendant to breach his contract with the plaintiff, but not against defendant in the two party contract, and cited *Hornstein, supra,* as authority. *Cuker, supra,* 178 N.Y.S.2d at 779.

In short, the contract(s), whether one or two, created separate rights as against American and General and imposed separate duties on defendants which technical passage of title did not eliminate. See *Gans, supra;* Carver,

---

13. Paragraph 8 of the Complaint reads:
"8. Pursuant to a contract of affreightment on or about February 19, 1966, Plaintiff Antar Industries, Inc. shipped and placed on board the SS DONA GISELLA, then lying in the port of Baltimore, 1,885 boxes of air conditioners and parts (hereinafter called the "Cargo") in good order and condition, which Defendant American Oriental Navigation Corp., in consideration of an agreed freight duly prepaid, agreed to carry and transport to the port of Kuwait and to there deliver said Cargo, in like good order and condition, as when shipped, to Aljassim Brothers, in accordance with the terms and conditions of a certain bill of lading issued and signed for the Master of the vessel SS DONA GISELLA on behalf of Defendant General Navigation Trading Co., S.A., as owner of the DONA GISELLA."

Carriage of Goods by Sea, 11th Ed. (1963), para. 57, at 47; Levatino Company v. M/S Helvig Torm, 295 F.Supp. 725 (S.D.N.Y.1968). Public policy requires that the rights of two contracting parties be protected from tortious interference—exactly that which we find occurred here; the fact that one may derive rights under the same agreement as two other contracting parties does not excuse interference with their contractual rights.

\* \* \*

### Damages resulting from tort

■ Damages which are the proximate result of the tort of interference with contract are recoverable so long as they are not speculative as to the fact of damage, even though they are not expressed in exact terms or are difficult to determine. Prosser, Torts (2nd Ed. 1955) § 106; William H. Rankin Co. v. Associated Bill Posters of U. S. and Canada, 42 F.2d 152 (2d Cir.), cert. denied, 282 U.S. 864, 865, 51 S.Ct. 37, 75 L.Ed. 765 (1930); Hannigan v. Sears, Roebuck & Co., 410 F.2d 285 (7th Cir.), cert. denied, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969); Exercycle of Michigan, Inc. v. Wayson, 341 F.2d 335 (7th Cir. 1965).

General's default admits the fact of damages; the only remaining question is the amount thereof. *Hughes* (1969), *supra*, 308 F.Supp. at 685.

### Injury to business reputation and loss of goodwill

Plaintiffs contend the measure of damages for the tort is loss of business reputation and goodwill for the years 1967–1969 measured by its loss of profits on sales which it would have made during that period but for the breach. *Rankin, supra*; *Hannigan, supra*; John-

son v. Chicago, M. S. P. & P. R. R., 400 F. 2d 968, 969 (9th Cir. 1968).

In a nutshell, plaintiffs urge this computation be made in several steps:

(1) Taking the average percentage of the Kuwait market held by Aljassim for the three years immediately preceding the breach;

(2) Taking the total air conditioner sales made in Kuwait during the years 1967–1969;

(3) Multiplying (1) by (2).

Plaintiffs' sales and projected sales (see Ex. 44) for 1960–1969 were as follows:

Aljassim sales and U. S. exports

(From Exs. 5 & 17)

| Year | U. S. exports to Kuwait | Antar sales to Aljassim | Aljassim sales to customers |
|---|---|---|---|
| 1960 | 7,342 | 400 | 400 |
| 1961 | 7,267 | 655 | 655 |
| 1962 | 13,753 | 1,146 | 1,146 |
| 1963 | 17,539 | 4,125 | 3,129 |
| 1964 | 19,082 | 3,700 | 2,439 |
| 1965 | 9,154 | 500 | 1,567 |
| 1966 | 19,888 | 2,191 | 2,350 |
| 1967 | 33,942 | 5,000 | 2,478 |
| 1968 | 30,146 | 200 | 1,632 |
| 1969 | 32,061 | 501 | 1,060 |

In establishing item (1) we take the percentage of the market for 1963–1965 as the measure of Aljassim's sales. We find this period represented the attainment by Aljassim of its full share of the market as compared to its early beginnings in 1960–1962. In addition, Aljassim had no excess inventory over sales in 1960–1962 and it therefore is inaccurate to use these years as a measure of Aljassim's actual ability to sell when sufficiently supplied with machines. In 1963, when Aljassim for the first time had sufficient machines to sell since offering air conditioners to the Kuwait public, their sales approximately tripled and resulted in an increase which accounted for approximately 50% of the total volume increase for the entire Kuwait market. In computing item (1), their mar-

ket share was therefore the average of 1963–1965, or 15.6%.

In measuring the damages for item (2), we can rely only on 1967 and not 1968 or 1969. Damages in the two latter years are remote from the tort and are speculative in amount beyond mere difficulty of determination.

Plaintiffs maintain vigorously and steadfastly that the markets for new air conditioners and old air conditioners (sold one year later at a 10% discount) are separate and the machines non-fungible; that the Kuwait public insists upon new air conditioners. We so found. Plaintiffs used this fact as a basis for damages for lost profits in 1966 and the 10% depreciation subsequently for retained inventory.

However, in 1968 and 1969, the import of new air conditioners was drastically reduced to 200 and 501 for each of the respective years. To assess plaintiffs' damages actual sales must be deducted from projected sales. However, since sales from inventory in excess of imports was 1,432 and 559 for the respective years and bearing in mind the Kuwait public preference for new machines, we find all new imports were sold during these years. We are at a loss to compute how many additional new machines would have been sold had they been in stock. The upsurge in sales of old machines, in light of the second class status of the old machine market, indicates that many additional new ones could have been sold.

A party cannot be expected to know exactly how many machines will be sold in a subsequent year.[14] However, such a

vast and fundamental deviation from prior business practice bordering on abandonment of the new machine market—in light of an extraordinarily large number of imports in the year preceding 1968 (5000) and an accompanying increase (2522) in old machine inventory in 1968 —cannot be justified measured by hindsight as mitigation of damages. This is especially true when each item of damage incurred by the unusual purchasing decisions of Aljassim in 1967–1969, in spite of the existing market for new air conditioners, is now sought as directly chargeable to defendants as profits on a lost sale.

 A different situation existed in 1967. That year immediately followed the events in question with the effect of General's conduct (Tr., pp. 127–128) being most immediately felt;[15] there was no intervening time span in which to rehabilitate plaintiffs' standing in the Kuwait market.

However, although the fact of damages for 1967 due to General's conduct is certain, the full amount claimed by plaintiffs should not be awarded. We were impressed by the demeanor, experience and candor (Tr. pp. 59ff, 149), of the witness Aljassim, including his frank acknowledgement that although the events in question had greatly affected his business, other factors could have affected his concern's performance in the Kuwait market (Tr. pp. 147–8).[16] Without impressive resistance by defendants, we find that one-half of the loss of profits during the year 1967 were due to factors other than the conduct of General and for which General should not be charged. In making this finding we es-

14. The business history of Aljassim bears this out.

15. Although proximate cause is usually an element of liability (already established) and intentional torts (which interference with contracts resembles in that there is similarity of elements including intention, knowledge, and wrongful conduct) do not necessarily require foreseeability, we find the damages in 1967 to have been reasonably foreseeable. See McCormick on Dam-

ages (1935), § 72, at 260; Prosser on Torts (2d Ed., 1955), § 106 at 745. Considerable lost sales and damages for loss of profits thereby in the year following the events in question are readily foreseeable for a concern relying on imports in a competitive (Ex. 16) market such as Aljassim in Kuwait.

16. See, e. g., Ex. 16, introduced by plaintiffs.

pecially take into account the witness' experience in the Kuwait air conditioning market since 1954, his evaluation of sales figures as a record of the business from 1960–1969, the growth and percentage of the market from 1960–1969, and the fact that customers were turned away in 1966 (Tr. pp. 147–149).

■ In computing the loss we take the 5295 projected machines for 1967 and subtract the 2478 actual sales, leaving 2817. One-half, or 1408 sales (approximately), were lost due to factors not related to the conduct of General. Therefore, 1408 (approximately) sales were due to General's conduct. With $73.83 as Aljassim's unit profit (Ex. 35), Aljassim's damages are $103,952.64 for injury to business reputation and loss of good will.

Antar suffered no loss on this item. Although it had 5295 projected sales to Kuwait in 1967 (Ex. 44, corrected to 15.6%) and 5000 actual sales with a purported loss of profit on 295 units (corrected), lost sales up to 1408 of these are attributable to causes other than General's tort. As Antar's sales and losses thereof correspond on a 1-1 basis to Aljassim's lost sales (Tr., pp. 17–19, 64, 67), Antar in its bumper year suffered no damage; only Aljassim's actual sales (2478) plus its projected sales lost due to the breach (1408), or 3886, were properly projected as Antar's sales for 1967, far below Antar's actual 5000 sales.

### Interest

■ Due to the immediate loss and delay in compensating plaintiffs, we award prejudgment interest as an item of damages at 6%. As to the 10% diminished value of late delivered units (Item 7 herein—$28,056) and the injury to business reputation and loss of goodwill (Item 8 herein—$103,952.64), computation of interest shall begin as of the date the damage accrued, January 1,

1967. As to all other items of damage, computation of interest shall begin as of the date of the breach of contract and commission of the tort, April 30, 1966 (Compl., para. 9). O'Donnell Transp. Co., Inc. v. City of New York, 215 F.2d 92 (2d Cir. 1954); Petition of City of New York, 332 F.2d 1006 (2d Cir. 1964); 3 Benedict on Admiralty (6th Ed., 1940), § 419 at 191 and Supplement (1968), pp. 48–49. None of the interest awards in items 1–8 are based on delay until judgment and therefore item 9 does not duplicate. Petition of City of New York, *supra*, at 1008.

### Recapitulation of damages

■ The items of damages are as follows:

| | | |
|---|---|---|
| 1. | Transportation expenses | $ 21,260.99 |
| 2. | Additional insurance costs | 4,424.00 |
| 3. | Expenses at Aden | 12,879.54 |
| 4. | Destroyed and missing parts | |
| | A. Destroyed parts: 4,986.47 | |
| | B. Missing parts: 2,580.00 | 7,566.47 |
| 5. | Repairs to units | 3,539.76 |
| 6. | Lost profits | 73,977.66 |
| 7. | Diminished value | 28,056.00 |
| 8. | Loss of goodwill, injury to business reputation | 103,952.64 |
| 9. | Interest | (as hereinabove indicated) |
| Total | | 255,657.06 plus interest |

Total Damages to:
Aljassim Brothers $255,657.06 plus interest
Antar Industries, Inc. 0 [17]

### Motions

Reserved decision on motions at the inquest are rendered as follows:

(1) Defendants' motion to dismiss count 2 of the complaint for legal insufficiency is denied for the reasons stated herein. However, as to Antar, counts 1 and 2 are dismissed for failure to prove damages.

■ (2) Plaintiffs' motion to modify the *ad damnum* clause to conform to the damage award is granted. Sarlie v.

17. Nominal damages are not awarded in admiralty. The Thrasyvoulos, 28 F.Supp. 434 (S.D.N.Y.1939).

E. L. Bruce Co., 265 F.Supp. 371 (S.D. N.Y.1967); Peitzman v. City of Illmo, 141 F.2d 956 (8th Cir.), cert. denied, 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577 (1944).

(3) Plaintiffs' motion to enter judgment against American and General despite the absence of defendant S.S. South Star is granted. There is no just reason for delay. See footnote 1 of this opinion; Rules 54(b) and 55(b) (2), F.R. Civ.P.; 6 Moore's Federal Practice, ¶ 55.06, at 1819.

*Judgment*

Judgment by default is hereby entered pursuant to Rule 55(b) (2), F.R.Civ.P. against General Navigation Trading Co., S.A. and American Oriental Navigation Corporation in favor of plaintiffs Mahmood Aljassim, Mishari Aljassim and Sadoun Aljassim d/b/a Mahmood Aljassim & Brothers in the amount of $255,657.06, plus interest.

As to Antar Industries, Inc., we find the issue of liability (as asserted in counts 1 and 2) established in its favor. However, the proof of damages flowing therefrom having been found insufficient, we dismiss its claim.

So ordered.