DOW CHEMICAL PACIFIC
LTD., Plaintiff,

v.

RASCATOR MARITIME S.A.; Intra-Span, Inc.; Mahmud Ahmed, a/k/a Mahmud Sipra; Miles A. Galin, M.D.; the Sanko Steamship Co., Ltd.; Sanko Kisen (U.S.A.) Corp.; M/V OGDEN FRASER, her engines, boilers, etc. Ogden Fraser Transport, Inc., Defendants.

MANUEL INTERNATIONAL INC., and Manuel International D.I.S.C., Inc., Plaintiffs,

v.

RASCATOR MARITIME S.A.; Intra-Span, Inc.; Mahmud Ahmed, a/k/a Mahmud Sipra; Miles A. Galin, M.D.; the Sanko Steamship Co., Ltd.; Sanko Kisen (U.S.A.) Corp.; M/V OGDEN FRASER, her engines, boilers, etc.; Ogden Fraser Transport, Inc., Defendants.

Nos. 79 Civ. 3131 (KTD), 80 Civ. 0359 (KTD).

United States District Court,
S.D. New York.

Oct. 9, 1984.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiffs Dow Chemical Pacific Ltd., Manuel Intern., Inc. and Manuel D.I.S.C. Intern., Inc.; Raymond P. Hayden, Philip Keith Yachmetz, New York City, of counsel.

W. Shelby Coates, Jr., New York City, for defendants Rascator Maritime, S.A. and Miles A. Galin, M.D.

**1492**

Anderson, Russell, Kill & Olick, P.C., New York City, for defendants Intra-Span, Inc. and Mahmud Sipra; John H. Gross, New York City, of counsel.

Zock, Petrie & Curtin, New York City, for defendants Sanko Kisen (U.S.A.) Corp. and Sanko S.S. Co., Ltd.; Philip J. Curtin, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendants Ogden Fraser Transport Inc. and M/V Ogden Fraser; Michael Marks Cohen, G. Elizabeth Reese, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Old fashioned piracy on the high seas and overwhelming greed are at the heart of this case. What makes the case unusual, however, is that the leader of the pirates is not a swashbuckling Long John Silver, but a grasping avaricious New York ophthalmologist who used other people and corporate shells to work his nefarious schemes. Once placed in the position where he might have to face justice, like a story-book pirate, the villain has lied and hidden in his attempt to avoid the repayment of the damages he has caused. His contempt for the law is truly astounding. This is the unusual situation where simple fairness demands that villain repay not only the plaintiffs' damages ordinarily cognizable at law but also the expenses the plaintiffs and innocent third parties incurred by the prosecution of this case.

In this consolidated action, plaintiffs Dow Chemical Pacific Ltd. ("Dow" or "Dow Chemical") and Manuel International Inc. and Manuel International D.I.S.C., Inc. (referred to collectively as "Manuel") seek to recover the costs of the transshipment of their cargo between Cadiz, Spain and Bombay, India and for damage to their cargo. A three-day bench trial was held June 26, 1984 through June 28, 1984.[1] The following shall constitute my findings of fact and conclusions of law.

### FACTS

In 1974, defendant Ogden Fraser Transport, Inc. ("Ogden"), owner of defendant *in rem* Liberian flag bulk carrier vessel the M/V Ogden Fraser ("Ogden Fraser"), entered into a contract of time charter with defendant Sanko Steamship Co., Ltd. ("Sanko") for a period of about six years. *See* Plaintiffs' Exh. A34. Sanko is a Japanese corporation with its principal place of business in Tokyo, Japan. It conducts business in the United States through defendant Sanko Kisen (U.S.A.) Corp. ("Sanko Kisen") which is incorporated in New York and has its principal office in New York City. *See* Sanko Exh. A(3) (agency agreement).

On November 17, 1978, Sanko, as disponent owner of the Ogden Fraser, sub-time chartered the vessel to defendant Rascator Maritime, S.A. ("Rascator"), a Liberian corporation. *See* Sanko Exh. A(1) (time charter party between Sanko and Rascator). Rascator was incorporated on February 17, 1978. *See* Court Exh. 1001. In October of 1978 Rascator opened a bank account at Sterling National Bank with an initial deposit of $483,926.53. *See* Plaintiffs' Exh. A3. Defendant Dr. Miles A. Galin, an ophthamologist who resides and maintains a practice in New York City, was the only individual who had signature rights for Rascator. *Id.* Defendant Intra-Span, Inc. ("Intra-Span") was assertedly Rascator's agent for conducting business in the United States. Defendant Mahmud Sipra was officer and director of Intra-Span.

The sub-time charter party between Rascator and Sanko provided for a "time charter trip via safe port[s] ... with redelivery D.O.P. Japan-Singapore Range." Sanko

---

1. At a pretrial conference held on June 14, 1984, counsel for defendant Dr. Miles Galin informed me that his client was planning to be in Europe during the time that the trial was to commence. I informed Dr. Galin's counsel, W. Shelby Coates, Esq., that the trial would proceed as scheduled and that his client should be present.

Dr. Galin was also under a valid subpoena. Nevertheless, Dr. Galin failed to appear at any time during the trial. After the trial had concluded, Dr. Galin moved to reopen. That motion was denied. See my Endorsement of July 27, 1984 for a full description of the behavior of Dr. Galin.

Exh. A(1). The charter hire was $5,400.00 per day to be paid "semi-monthly in advance in U.S. dollars via telegraphic transfer to Owner's bank account." *Id.* As partial security for the charter hire, Sanko procured an irrevocable commercial letter of credit in the amount of $167,400.00. Plaintiffs' Exh. A1. The letter of credit was dated December 21, 1978 and would expire if it was not presented for payment at Sterling National Bank on or before March 19, 1979. *Id.* The letter of credit was "by order of Rascator Maritime, S.A. c/o M. Galin, 180 East End Avenue, New York, N.Y." *Id.* By letter dated December 29, 1979 the letter of credit expiration date was extended until April 19, 1979. *Id.*

The Ogden Fraser was delivered to Rascator at the port of Seven Islands in Canada on November 19, 1978. She proceeded to Montreal, Canada, where Dow's cargo of approximately 2,440,066 pounds of bagged high density polyethelyene resin was loaded aboard the Ogden Fraser. *See* Plaintiffs' Exhs. A38 (cargo manifest); B1 at 1 (survey report, January 13, 1979). Clean-on-board bills of lading stamped December 30, 1978 were issued for Dow's cargo. Plaintiffs' Exh. A21 (nineteen bills of lading numbered 7 through 25). The booking note dated December 28, 1978 provided for freight of $110.00 per metric ton prepaid plus wharfage. Plaintiffs' Exhs. A18, A44. The booking note provided that Dow's cargo would be shipped from Montreal, Canada to Bombay, India and that transshipment was not allowed but it incorporated the terms of the bill of lading. *Id.* Although the booking note disallowed transshipment, the bills of lading provided:

> [w]hether expressly arranged beforehand or otherwise, the Carrier shall be at liberty to carry the goods to their port of destination by the said or other vessel or vessels either belonging to the carrier or others, or by other means of transport, proceeding either directly or indirectly to such port and to carry the goods or part of them beyond their port of destination, and to transship, land and shore the goods either on shore or afloat and re-

ship and forward the same at Carrier's expense but at Merchant's risk.

*See, e.g.,* Plaintiffs' Exh. A106.

Sanko had no involvement with the negotiations for the shipment of the chemical and steel cargoes or any cargo on the voyage. It did, however, direct the master of the Ogden Fraser to authorize Rascator to issue bills of lading against mate's receipts. *See* Sanko Exh. A(12). The "conline" bills of lading were signed by Rascator's Canadian agent, Colley Motorships Ltd. "as agents."

After departing Montreal, the Ogden Fraser proceeded to Quebec where additional cargo was loaded and a "loading, stowing, securing and lashing" survey was performed. *See* Plaintiffs' Exh. B1. Thereafter, the vessel proceeded to New Orleans where approximately 1,487 metric tons of plaintiff Manuel's steel was loaded. *See* Consent Pretrial Order ("PTO") ¶ 13. Manuel's steel cargo was bound also for Bombay, India. Cymeon Shipping Corporation, on behalf of freight forwarders Black & Geddes, Inc., arranged the shipment of Manuel's cargo. *See* Plaintiffs' Exh. A42 (Manuel's complete file) (December 26, 1978 letter from Benjamin F. Butler confirming terms of shipment). Manuel's steel cargo was to be shipped pursuant to fourteen bills of lading. Transcript ("Tr.") 80.

The Ogden Fraser was late arriving in New Orleans and Manuel wanted to draw down on a letter of credit but was unable to do so until its cargo was loaded and bills of lading were issued. *See* Tr. 74, 77 (testimony of Manuel Feingold). Ogden Exh. 3. Thus, Manuel procured from Rascator the premature issuance of four of the fourteen bills of lading. *Id.* The four bills are dated December 31, 1978 and stamped "on board," yet the vessel did not arrive in New Orleans until January. Tr. 71, 74, 77.

After Manuel's cargo was loaded, a check for freight and ten bills of lading obtained from the freight forwarders were presented to Rascator through Sipra and W. Shelby Coates, Esq., attorney for Rascator and Dr. Galin, and ultimately were sent to Rascator's agent in New Orleans but the bills of lading were returned un-

signed to plaintiff on February 12, 1979. *See* Plaintiffs' Exh. X9 (transcript of hearing before Judge Goettel on February 14, 1979), at 13. Apparently, underlying Rascator's refusal to sign the bills of lading was a dispute between Manuel and the Rascator group concerning "deadfreight." The booking arrangements initially called for a shipment of approximately 6,000 metric tons of steel. *See* Plaintiffs' Exh. A44. Manuel, however, had only 1,487 metric tons of steel available for shipment in New Orleans. *See* Tr. 65. Thus, Rascator refused to issue the remaining ten bills of lading based on a claim of outstanding deadfreight. *See id.* at 17. I note that the Ogden Fraser had sailed from New Orleans on February 3, 1979 with Manuel's cargo on board and the dispute over the issuance of the bills of lading did not occur until February 7, 1979. *See id.* at 14; Plaintiffs' Exh. A36.[2] In effect Rascator was holding the cargo for ransom and tripling the cost to Manuel of the shipment after it was loaded and at sea.

On February 13, 1979, Manuel commenced an action against Rascator (among others) and at the same time moved by Order to Show Cause to compel the issuance of the ten bills of lading and the acceptance of the tendered freight. *See* Complaint, 79 Civ. 0795 (GLG). The following day, Judge Goettel directed the defendants to issue the bills of lading and enjoined defendants from selling or otherwise disposing of Manuel's cargo except to the proper consignees in Bombay, India. PTO, Exh. A–1. Pursuant to Judge Goettel's order, Rascator issued the remaining bills of lading.

On February 18, 1979, four days after Judge Goettel's order, the master of the vessel received a radio message from "Aquaship" New York to proceed to Cadiz, Spain. *See* Plaintiffs' Exhs. A36, A37 (telexes in and out of Ogden Fraser). In the meantime, while the vessel was on the high seas a proposal was made by Rascator and Sipra to have Manuel sell the steel cargo then aboard the vessel which steel was owned by others not party to this suit. This larcenous plan was specifically approved by Dr. Galin. Manuel refused. The Ogden Fraser arrived at port in Cadiz on February 20, 1979 where Manuel's steel cargo and Dow's chemical cargo were discharged. PTO ¶ 14. Sipra and W. Shelby Coates, Esq., visited the vessel in Cadiz. *See* Sipra Dep. at 185–86.

Both Ogden and Sanko became aware, shortly before the vessel arrived in Cadiz, that Rascator had diverted the vessel. *See* Tr. 193–94 (testimony of Charles Nisi, president of Sanko-Kisen (U.S.A.)); Sanko Exh. A24 (telex sent March 1, 1979 to Rascator concerning discharge of cargo in Cadiz).[3] Dow, however, was unaware of the status of its cargo until approximately *two months* after its cargo had been dumped on the pier in Cadiz. *See* Plaintiffs' Exh. X12 at 6 (transcript of April 11, 1979 hearing before Judge Owen in *Rascator Maritime, S.A. v. Phillipp Overseas, Inc., et al.*).

Upon learning of the discharge in Cadiz of its cargo, Manuel sought the release of its cargo or an order directing transshipment to Bombay by Rascator. Hearings before Judge Owen were held March 30, 1979, April 4, 1979, and May 10, 1979.

---

**2.** After the Ogden Fraser left port at New Orleans on February 3, 1979, it proceeded toward Freeport, Bahamas to take on bunker fuel. *See* Plaintiffs' Exh. A36. She failed, however, to stop at port in Houston, Texas where she had been scheduled to load cargo. *Id.* After the vessel had been cleared for Freeport, Dr. Galin through Rascator changed the orders and the Ogden Fraser proceeded to Bridgetown, Barbados where she took on fuel and was visited by Dr. Galin. *See* Plaintiffs' Exh. 6 (Deposition of Mahmud Ahmed Sipra ("Sipra Dep.")) at 213. After departing Barbados, the Ogden Fraser proceeded supposedly toward Kuwait via the Suez Canal.

**3.** Sanko-Kisen wrote in its March 1, 1979 telex:

With respect to NOLA Steel cargoes, once that cargo was loaded aboard, the vessel itself became bound to deliver that cargo to destination. Assuming you have the right to transship, you must do so promptly or risk a finding of deviation which could subject the Ogden Fraser to arrest and consequent serious damage to our principals for which we hold you fully responsible.

Defendant Sanko Exh. A(24).

Finally, Manuel obtained an order from Judge Owen on May 10, 1979 directing Rascator to transship plaintiffs' cargo to Bombay, India. *See* PTO, Exh. A–2. The order provided also for fines and the dismissal of Rascator's action for deadfreight and damages based on the four prematurely issued bills of lading in the event it did not comply with the order. *Id.* Despite the issuance of the May 10th order as well as of other similar orders, plaintiffs' cargo was discharged in Cadiz at the direction of Dr. Galin and neither Dr. Galin, Sipra nor the other defendants arranged for transshipment to Bombay, India.[4] On January 6, 1981, a default judgment was entered against Rascator in its action for deadfreight for failure to comply with the court's order. Final default was entered against Rascator on December 10, 1982. If the orders of this court had been complied with the damages suffered by the parties would have been negligible. The callous disregard of appropriate and lawful court orders has escalated a minor problem into a major case. The evidence shows that the person mainly responsible for these contemptuous decisions was Miles A. Galin.

It is unnecessary to follow the peregrinations of the Ogden Fraser after the plaintiff's cargoes were dumped in Cadiz. Suffice it to say that Rascator and Dr. Galin did not pay the full charter hire and yet they continued their control over the ship until June 24, 1979. The defendant Sanko on regaining control of the ship then delivered apparently at its own expense the cargo left aboard by Rascator.

Dow Chemical initially commenced its actions on June 15, 1979 against only Rascator, Intra-Span, Sipra and Dr. Galin. On December 14, 1979, an amended complaint was filed in which Sanko and Sanko Kisen, Ogden and the Ogden Fraser were added as defendants.

Manuel commenced its action on January 18, 1980 alleging that defendants discharged its steel cargo at the Port of Cadiz in "short and/or otherwise damaged condition." Manuel Complaint ¶ 13.

## DISCUSSION

### I.

■ The Carriage of Goods by Sea Act ("COGSA") provides that a deviation "in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of [COGSA] or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom." 46 U.S.C. § 1304(4). However, the Act provides also that "if the deviation is for the *purpose of loading or unloading cargo* or passengers *it shall, prima facie, be regarded as unreasonable.*" *Id.* (emphasis supplied).

It is undisputed that Manuel's steel cargo and Dow's chemical cargo was bound for Bombay, India. Furthermore, there is no question that it was offloaded at the Port of Cadiz for nefarious reasons of the defendants Rascator, Dr. Galin and Sipra. There has been no suggestion by defendants that the deviation was to save life or property at sea and there was no evidence introduced tending to establish that the deviation was reasonable. There is no question that plaintiffs may recover all those damages flowing from the premature offloading of the steel and chemical cargo. Thus, I conclude that plaintiffs Manuel and Dow may recover reimbursement for (1) transshipment costs, and (2) wharfage costs, dock taxes, tariff charges, warehouse storage costs, repacking costs, trucking and pier charges, and stevedoring charges.[5] Furthermore, miscellaneous expenses for items such as survey costs, offi-

---

**4.** At the same time that plaintiffs were making efforts to compel the transshipment by the Rascator group of their cargo to Bombay, Sanko was attempting to procure from Rascator an extension of the expiration date of the letter of credit which was due to expire on April 19, 1979. Dr. Galin refused to agree to the extension, the letter of credit expired, and on April

21, 1979, Rascator ceased making charter hire payments to Sanko despite the fact that the vessel was in service until June 24, 1979. *See* PTO ¶ 17. Sanko then carried the cargo left aboard the Ogden Fraser to destination in the Persian Gulf and India. *See id.* ¶ 18.

**5.** Manuel's costs for transshipment aboard the Maliakos to Bombay were 6,189,398 pesetas

cial fees and reconditioning costs are fully compensable.[6] *See Aljassim v. S.S. South Star*, 323 F.Supp. 918, 923–24 (S.D.N.Y. 1971).

## II.

I turn to plaintiffs' claims of physical damage to their cargo. COGSA provides that the carrier has a responsibility to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2). In order to recover under COGSA, plaintiffs must show that their "goods were damaged while in the carrier's custody." *Caemint Foods v. Lloyd Brasileiro, Companhia De Navegacao*, 647 F.2d 347, 351 (2d Cir.1981). Plaintiffs can sustain their burden by establishing that the cargo was delivered in good condition but discharged in damaged condition. *Id.* A "clean" bill of lading is *prima facie* evidence that the cargo was delivered to the carrier in good condition. 46 U.S.C. § 1303(4). The bills of lading issued for Manuel's cargo and Dow's cargo were "clean." There is no evidence to show that there was any damage to Dow's shipment before it was loaded on the Ogden Fraser.

Notwithstanding the fact that a "clean" on-board bill of lading was issued for Manuel's steel cargo, the reports for surveys performed upon loading in New Orleans indicate that the steel was rusted and pitted and that the packaging of the steel sheets and coils would make loading, handling, and stowage difficult. *See* Plaintiffs' Exh. B5 (survey report by Charles Riemer). Another surveyor, Hugh Graham, remarked that the steel cargo appeared to be rusty and pitted. Plaintiffs' Exh. A41. The surveyor stated also that "[n]umerous tests were made at random with a silver nitrate solution, the result showing negative reactions only or contact with fresh water." *Id.* Thus, I find that when it was placed in the carrier's custody, Dow's cargo was in sound condition. Manuel's cargo, however, had rust damage prior to being placed in the carrier's custody.

Before turning to the condition of the cargo at the time plaintiffs regained possession of their cargo it should be noted that under COGSA, a carrier has a non-delegable duty to properly and carefully load, unload, and stow the shippers' cargo. *See Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 330 (2d Cir.1972). Dow's cargo was damaged by forklift trucks during the loading operation in Montreal. *See* Sanko Exh. A(16). Dow's cargo was damaged also during and after its discharge in Cadiz. Because Dow did not learn of the discharge of its cargo in Cadiz until approximately two months after the discharge, plaintiff could not take measures to ensure the protection of its cargo until then. The surveyors in Cadiz examined the chemical cargo in a warehouse on April 20, 1979 and May 10–11, 1979. Plaintiffs' Exh. A59. The surveyors found pallets that had been completely destroyed, ripped and empty bags,

(pts). Plaintiffs' Exhs. A75, A88. Other transshipment costs included bank charges (pts 26,012), telex expenses (pts 10,269), long-distance telephone charges (pts 27,136), mail expenses (pts 2,060), World Courier charges (pts 23,460) and the fees for an agent in Cadiz, (pts 68,646). Manuel incurred other expenses associated with the transshipment of its cargo. *Id.* They include watch duty (pts 866,709), area cover, etc., (pts 213,344), truck charges (pts 2,769,780), area space (pts 262,880), space occupation (pts 1,026,080), rental of tarps in free zone (pts 15,500), check inspection (pts 184,200), moving (pts 669,500), surface area occupation (pts 42,400), tax, duty and tariff (pts 136,869), iron strapping and classification (pts 185,675), and customs office fees (pts 70,975). *See* Plaintiffs' Exh. A76.

Dow's costs to transship its cargo aboard the Zim Australia are set forth in its exhibits A71, A54, and A62. They include the cost of freight (pts 9,664,789), *see* Plaintiffs' Exhs. A62, A71, packing of containers (pts 688,350), transfer, stowing and loading (pts 450,075), other packing and transfer operations (pts 174,735), dock tax (pts 60,363), wharfage (pts 120,726), space (pts 44,000), payments to shipper and customs agent (pts 150,000), and tax (pts 30,737). *See* Plaintiffs' Exh. A71. In addition, Dow incurred approximately pts 457,276 in warehousing costs. *See* Plaintiffs' Exhs. A61, A71.

6. The survey costs incurred by Dow and Manuel are compensable as a natural and foreseeable consequence of defendants' improper and illegal discharge. Dow's survey expenses were pts 206,427, *see* Plaintiffs' Exhs. A66, A71, and Manuel's survey was pts 40,016, *see* Plaintiffs' Exh. A85. Other expenses included tariffs (pts 195,939), dock tax (pts 50,896), and repacking costs (pts 371,890). *See* Plaintiffs' Exh. A71.

warped pallets, and "a great deal of the material spilled all over the warehouse." *Id.* Some of the pallets were reconditioned and some of the loose resin were rebagged in "domestic bags." *Id.* Before being reloaded for transshipment, Dow's cargo was packaged in seventy-five containers. *Id.;* Plaintiffs' Exh. A63. A second survey was performed on June 5, 1979 in Cadiz and the surveyors estimated that approximately 20,000 kilograms ("kgs") of the resin was missing from the total cargo of 1,087,200 kgs. Plaintiffs' Exh. A95.

After Dow's cargo had arrived in Bombay on or about September 29, 1979, and it had been unloaded from containers it was examined by surveyors on November 6, 1979. Plaintiffs' Exh. B3. The surveyor noted that there was a shortage of approximately 190,950 kgs of resin. *Id.* Manuel's cargo was also surveyed in Bombay and a shortage of approximately 2,104 kgs was found. Plaintiffs' Exh. B7. The surveyor attributed the shortage to pilferage in Cadiz or in transit or while awaiting clearance for Bombay. *Id.*

■ Thus, while plaintiffs have established that their cargo was delivered "short,"[7] they have not sustained their burden of proving that the delivered cargo was damaged while in the carrier's possession. For example, Dow has not submitted any evidence tending to show that the resin was contaminated or that it had decreased in value in any way. Likewise, Manuel has not sustained its burden of proving that the condition of the steel had deteriorated once it had been delivered to Ogden Fraser.

### III.

■ I turn to the liability of the individual defendants. Under COGSA, "carriers" are liable for unreasonable deviations and damage to cargo. A "carrier" is "the owner or the charterer who enters into a contract of carriage with a shipper." 46 U.S.C. § 1301(a); *see Trade Arbed, Inc. v.*

*S/S Ellispontos,* 482 F.Supp. 991, 994 (S.D. Tex.1980). It is apparent that Rascator through its agents signed the bills and thus became a COGSA carrier, *see* 46 U.S.C. § 1301(b). *See Sunil Industries v. S/S Ogden Fraser,* 80 Civ. 4564 (CBM), Memorandum and Order filed August 26, 1981.

■ Furthermore, the general rule is that the "responsibility for cargo loss falls on the one who agreed to perform the duty involved .... In the absence of a special provision in the Time Charter, however, the duty to load, stow and discharge cargo ... falls upon the ship and her owner." *Nissho-Iwai Co., Ltd. v. M/T Stolt Lion,* 617 F.2d 907, 914 (2d Cir.1980), *appeal after remand,* 719 F.2d 34 (2d Cir.1983). Here, however, the charter party between Ogden and Sanko provided that the captain of the vessel, though appointed by the owners, "shall be under the orders and directions of the Charterers" and that "Charterers are to load, stow and trim and discharge the cargo at their expense under the supervision of the Captain who is to sign Bills of Lading." Plaintiffs' Exh. A34 (Time Charter) ¶ 8. The same provision appears in the time charter party between Sanko and Rascator. *See* Sanko Exh. A(1). Thus, Rascator, under the sub-time charter was responsible for controlling the direction of and the loading and discharge of the vessel. *See Joo Seng Hong Kong Co., Ltd. v. S.S. Unibulkfir,* 493 F.Supp. 35, 40 (S.D.N.Y. 1980). Indeed, Rascator *in fact* directed the Ogden Fraser to Cadiz and was totally responsible for ordering and supervising the unloading of plaintiffs' cargo at port in Cadiz. Finally, Rascator had the duty, which it failed to fulfill, to deliver plaintiffs' cargo to Bombay. Rascator's assertion that in arranging for transshipment themselves, plaintiffs somehow tortiously interfered with Rascator's contract is totally absurd.

■ There is a question, however, whether Ogden and Sanko[8] are also liable

---

7. Dow claims damages for the damage to its cargo and for short delivery in the amount of $42,292.99. I have found that Dow's delivery was short. *See* Plaintiffs' Exhs. B3, A95. Manuel's cargo was also noted by surveyors to be

short by approximately 2,104 kgs. *See* Plaintiffs' Exh. B7.

8. It is undisputed that Sanko-Kisen acted as the agent for its disclosed principal Sanko. The law of agency applies to general maritime cases, and

as carriers under COGSA. They were not parties to the contracts of carriage with plaintiffs and did not sign the bills of lading. *See Yeramex International v. S.S. Tendo,* 595 F.2d 943, 948 (4th Cir.1979); *Demsey & Associates, Inc. v. S.S. Sea Star,* 461 F.2d 1009, 1015 (2d Cir.1972). Furthermore, they had nothing to do with soliciting shippers or directing the vessel. Some connection with the shippers or contract of carriage generally has been required as a prerequisite to the imposition of liability on the owner and charterer in addition to the voyage charterer. *See Yeramex International,* 595 F.2d at 948. Judge Sand, however, in *Joo Seng Hong Kong Co., Ltd. v. S.S. Unibulkfir,* broadly interpreted "carrier" and held that even absent a contractual relationship the owner was liable to the plaintiff but that the owner could seek indemnification from the charterer. 483 F.Supp. 43, 45 (S.D.N.Y.1979). I find that under the plain language of COGSA, Sanko and Ogden did not "enter into a contract of carriage with [the] shipper[s]" and cannot therefore be held liable as "carriers."

■ The vessel is liable *in rem* for plaintiffs' loss. Once the cargo was loaded on board the Ogden Fraser, she became liable under COGSA as a carrier. This is true even if the master did not sign the bills of lading and even though four of the bills of lading for Manuel's cargo were issued prior to the vessel's arrival in New Orleans because by accepting plaintiffs' cargo, the contract of carriage evidenced by the bills of lading was ratified. *See Demsey & Associates, Inc.,* 461 F.2d at 1015. Ogden, as owner of the Ogden Fraser, however, is fully indemnified by Rascator. *See id.* at 1017.

## IV.

■ Plaintiffs assert that defendants Sipra and Dr. Galin should be held personally liable for the breach by Rascator and Intra-Span of the contract of carriage. The test for piercing the corporate veil in a maritime context was enunciated in *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980). The individual must have used the corporate entity to "perpetrate a fraud or have so dominated and disregarded" the corporate entity's form that the entity "primarily transacted [the individual's] personal business rather than its own corporate business." *Id.* It is true, as Dr. Galin and Sipra suggest, that piercing the corporate veil is not justified simply because they are sole owners or in sole control and that individuals may indeed incorporate to avoid personal liability. But I find that there was an abundance of evidence in the record to indicate that Dr. Galin used Rascator and Sipra used Intra-Span to a fraudulent end.

Manuel Feingold, President of Manuel, testified at trial that a meeting was held at Sipra's office before Manuel was successful in obtaining the last ten bills of lading. Tr. 63. Present at the meeting were Feingold, Anne O'Brien, the Vice President of Manuel, Sipra, and Wajid Mizra who was a business associate of Sipra's. Tr. 64. Feingold testified:

> At that point Mr. Sipra produced for us a spread sheet of all the cargo—all the steel cargo on board that vessel of our three competitors, Philipp Overseas, B.S. Livingston and Doolan Steel, and Doolan Steel was also known as National Steel, and wanted us, meaning Anne O'Brien and myself, to join with Sipra and with Dr. Galin to resell these very same goods from Spain to Pakistan or from—I'm sorry, to resell them at that point from on board the vessel to Pakistan.

Tr. 65. Thereafter, Feingold testified, he and Anne O'Brien went to Dr. Galin's office on 39th Street where the plan was reconfirmed by Dr. Galin. Tr. 67. O'Brien and Feingold then discussed the meeting with Manuel's attorney who advised against speaking with Sipra again and two

under agency principles, an agent for a disclosed principal is not liable to the third party. *See Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980); *see also Owen Steel Co. v. George A. Fuller Co.,* 563 F.Supp. 298, 300 (S.D.N.Y.

1983). Thus, I conclude that Sanko-Kisen is not liable for any breach of the contract of carriage and plaintiffs' complaints are therefore dismissed as against it.

days later Manuel was notified that its goods were offloaded in Cadiz. Tr. 69.

I find that this testimony was totally credible and that Dr. Galin used Rascator and Sipra used Intra-Span in order to further their fraudulent plan by which certain cargo, including plaintiffs' cargo was to be resold to other than the proper consignees in Bombay.

Dr. Galin's attempt during his deposition to disavow any knowledge of the shipping industry[9] is incredible in light of his business association with Sipra, see Plaintiffs' Exh. X4 at 43, and his involvement with Cargo Dispatch, Inc. and Capricorn Commodities, Inc., see Plaintiffs' Exhs. 31, 32. Furthermore, Sipra's attempt to represent Dr. Galin as the prime if not sole actor in this whole fiasco, see, e.g., Plaintiffs' Exh. X6 (Deposition of Mahmud Ahmed Sipra), is equally astonishing when Sipra's financial condition and relationship with the shipping industry and the testimony of Manuel Feingold is considered. Both Dr. Galin and Sipra played active roles in making the booking arrangements. In addition, the Ogden Fraser, pursuant to Dr. Galin's orders, transmitted through Rascator and despite the objections raised by Ogden and Sanko, proceeded to Cadiz where it unlawfully discharged plaintiffs' cargo. Furthermore, once the letter of credit in Sanko's favor expired (Sanko having unsuccessfully attempted to obtain an extension from Dr. Galin), Rascator ceased paying charter hire. I note also that the letter of credit had been by "Rascator c/o Miles A. Galin" and Dr. Galin had signed the first check which was overdue for charter hire. Indeed, the only individual with signature authority for Rascator was Miles Galin.

After hearing the testimony of Salvatore Colonna, Vice President of Sterling National Bank, and after reviewing Dr. Galin's financial records that Sterling reluctantly produced, see tr. 173–178, there is no question in my mind that Dr. Galin totally ignored Rascator's corporate form. The financial documents disclose a consistent practice on Dr. Galin's part of transferring funds between his personal account to Rascator's corporate account. See Plaintiffs' Exh. A99. Furthermore, the following colloquy took place between the court and Colonna:

THE COURT: Was the bank looking to Dr. Galin to guarantee the confidence in this instance?

THE WITNESS: Of course, yes.

THE COURT: No doubt about it. As far as you were concerned [Rascator's] account was Dr. Galin's account, wasn't it?

THE WITNESS: He was responsible for the overdrafts. (Tr. 172–73)

.    .    .    .    .

THE COURT: Where did you expect to get it?

THE WITNESS: In all probability from charter party monies or if necessary, from Dr. Galin.

THE COURT: As a practical matter, the bank looked at all these accounts like one big lump with Dr. Galin backing the whole thing, right?

THE WITNESS: Without Dr. Galin, I am sure these credits wouldn't have been made.

THE COURT: Okay, and no loans would be made either?

THE WITNESS: No.

Dr. Galin treated Rascator as his alter ego particularly when he drained Rascator of the profits of his fraud. His bankers, at his instruction, treated Rascator as his alter ego in assisting his iniquitous schemes. Justice demands that the corporate veil be pierced to hold the main culprits liable for their illegal acts.

## V.

In conclusion, plaintiffs have sustained their burden of proving a deviation and breach of the contracts of carriage by de-

---

9. One example of Dr. Galin playing the financier and pleading ignorance of the intricacies of the shipping industry is when he stated that he did not understand certain shipping terms, see

Plaintiffs' Exh. X4 (Deposition of Miles A. Galin, M.D.) at 116, and that Mr. Sipra managed and operated the shipping business, see id. at 127–28:

**1500**

fendants the M/V Ogden Fraser, Rascator, Intra-Span, Dr. Galin and Sipra. The plaintiffs' complaints are dismissed as against Sanko, Sanko-Kisen and Ogden. Ogden, on behalf of the Ogden Fraser, is entitled to indemnification from Rascator, Intra-Span, Dr. Galin and Sipra. Plaintiffs are directed to submit a judgment within ten days of the filing of this opinion on five days' notice. Plaintiffs should also submit documentation of the exchange rate between Spanish pesetas and United States dollars at the time that the expenses were incurred.

■■■■ Costs and attorneys fees are awarded to the plaintiffs and to Sanko and Ogden based on the bad faith exception to the general rule which precludes an award of attorneys fees to the prevailing party. *See Weinberger v. Kendrick*, 698 F.2d 61, 80 (2d Cir.1982) (there exists an exceptional power to shift fees where an action has been commenced or conducted in "bad faith, vexatiously, wantonly or for oppressive reasons.") (citations omitted), *cert. denied*, — U.S. —, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *see also Faraci v. Hickey-Freeman Co.*, 607 F.2d 1025, 1028 (2d Cir.1979) (equitable principles governing award of attorneys fees to do justice are not displaced by legislative authority to award fees.). As I have stated, the intentional and wanton acts of Dr. Galin and Sipra caused plaintiffs' financial losses as well as the legal expenses incurred by their co-defendants. The callous indifference to the law exhibited by Dr. Galin and Sipra from the inception of these actions in 1979 to the day of trial is only one example of their bad faith. Justice in this case will not be served absent an award of attorneys fees to plaintiffs, Sanko, and Ogden who were the target of and/or innocent bystanders to the scheme perpetrated by Dr. Galin and Sipra. The law firm of Zock, Petrie & Curtin, counsel for Sanko, having submitted adequate documentation, may recover $84,485.54 from defendants Rascator, Dr. Galin, Intra-Span and Sipra and the law firm of Burlingham Underwood & Lord, having also submitted adequate documentation of expenses and hours may recover $84,411.98 from the same defendants.

Sanko and Ogden are directed to submit judgments for their attorneys fees within ten days on five days' notice. Dow Chemical is directed to submit a proposed judgment on notice for its attorneys' fees supported by adequate documentation.

SO ORDERED.