782 F.2d 329
 1986 A.M.C. 1445, 4 Fed.R.Serv.3d 583
 DOW CHEMICAL PACIFIC LTD., Plaintiff-Appellee,
v.
RASCATOR MARITIME S.A., Intra-Span, Inc., Mahmud Ahmed,
a/k/a Mahmud Sipra, Miles A. Galin, M.D., the Sanko
Steamship Co., Ltd., Sanko Kisen (U.S.A.) Corp., M/V OGDEN
FRASER, her engines, boilers, etc., and Ogden Fraser
Transport, Inc., Defendants,
Rascator Maritime S.A., Intra-Span, Inc., Mahmud Sipra,
Miles A. Galin, M.D., and M/V Ogden Fraser,
Defendants-Appellants,
The Sanko Steamship Co., Ltd., Sanko Kisen (U.S.A.) Corp.,
Ogden Fraser Transport, Inc., Defendants-Appellees.
MANUEL INTERNATIONAL INC. and Manuel International D.I.S.C.,
Inc., Plaintiffs- Appellees,
v.
RASCATOR MARITIME S.A., Intra-Span, Inc., Mahmud Ahmed,
a/k/a Mahmud Sipra, Miles A. Galin, M.D., The Sanko
Steamship Co., Ltd., Sanko Kisen (U.S.A.) Corp., M/V OGDEN
FRASER, her engines, boilers, etc., and Ogden Fraser
Transport, Inc., Defendants,
Rascator Maritime S.A., Intra-Span, Inc., Mahmud Sipra,
Miles A. Galin, M.D., and M/V Ogden Fraser,
Defendants-Appellants,
The Sanko Steamship Co., Ltd., Sanko Kisen (U.S.A.) Corp.,
Ogden Fraser Transport, Inc., Defendants-Appellees.
 Nos. 1130, 1131, 1132 and 1143, Dockets 85-7068, 85-7086,
85-7106 and 85-7110.
 United States Court of Appeals,
Second Circuit.
 Argued June 3, 1985.
Decided Jan. 21, 1986.
 
 Raymond P. Hayden, New York City (Sanford E. Balick, John F. Ryan, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, on the brief), for plaintiffs-appellees.
 W. Shelby Coates, Jr., New York City, for defendant-appellant Rascator Maritime S.A.
 Robert E. Goldman, Garden City, N.Y. (Jesse I. Levine, John F. Kaley, Shaw, Goldman, Licitra, Levine & Weinberg, P.C., Garden City, N.Y., on the brief), for defendant-appellant Miles A. Galin, M.D.
 John H. Gross, New York City (Ann V. Kramer, Anderson, Russell, Kill & Olick, P.C., New York City, on the brief), for defendants-appellants Intra-Span, Inc., and Mahmud Sipra.
 Michael Marks Cohen, New York City (Elizabeth Reese, Burlingham Underwood & Lord, New York City, on the brief), for defendant-appellant M/V OGDEN FRASER and Defendant-Appellee Ogden Fraser Transport, Inc.
 Philip J. Curtin, New York City (Mary T. Reilly, Zock, Petrie & Curtin, New York City, on the brief), for defendants-appellees The Sanko Steamship Co., Ltd., and Sanko Kisen (U.S.A.) Corp.
 Before MESKILL, NEWMAN, and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Rascator Maritime S.A. ("Rascator"), Intra-Span, Inc. ("Intra-Span"), Mahmud Ahmed, a/k/a Mahmud Sipra ("Sipra"), Miles A. Galin, M.D., and M/V OGDEN FRASER ("OGDEN FRASER") appeal from a series of judgments entered in the United States District Court for the Southern District of New York, after a bench trial of these consolidated actions before Kevin Thomas Duffy, Judge, awarding damages and attorneys' fees to plaintiff cargo owners, and indemnification and attorneys' fees to defendants ship owner and time charterer, on account of an improper deviation of the OGDEN FRASER and the discharge by the OGDEN FRASER of plaintiffs' cargoes at an unauthorized port, in breach of the carriage contracts and in violation of the Carriage of Goods by Sea Act, 46 U.S.C. Sec. 1300 et seq. (1982) ("COGSA"). On appeal, appellants mount many challenges to the district court's procedural decisions, its findings on the merits, and its determination to award attorneys' fees. We find merit only in the contention that the court did not make findings sufficient to support an award of attorneys' fees, and we remand for further proceedings on the matter of fees. In all other respects we affirm the judgments.I. BACKGROUND
 
 
 2
 Plaintiff Dow Chemical Pacific Ltd. ("Dow") was the owner of approximately 2,440,000 pounds polyethylene resin, which it sought, in December 1978, to ship aboard the OGDEN FRASER from Montreal, Canada, to Bombay, India. Plaintiffs Manuel International Inc. and Manuel International D.I.S.C., Inc. (together "Manuel"), were the owners of some 2,500 tons of steel which they sought, in December 1978, to ship aboard the OGDEN FRASER from New Orleans, Louisiana, to Bombay.
 
 
 3
 The OGDEN FRASER was a general cargo vessel owned by defendant Ogden Fraser Transport, Inc. ("Ogden"); it had been time chartered to defendant The Sanko Steamship Co., Ltd. ("Sanko"), through Sanko's agent, defendant Sanko Kisen (U.S.A.) Corp. ("Sanko Kisen"). In November 1978, the OGDEN FRASER was sub-time chartered by Sanko to Rascator, a Liberian corporation. Galin, a New York City ophthalmologist, was an individual who, as set out in greater detail in Part II.D.3. below, acted on behalf of Rascator. Intra-Span was a corporation which conducted business in the United States on behalf of Rascator; Sipra, a Pakistani residing in the United States, was president and sole stockholder of Intra-Span.
 
 A. The Events
 
 4
 The pertinent events of the winter of 1978-79 are set forth in greater detail in a reported opinion of the district court, 594 F.Supp. 1490 (S.D.N.Y.1984), and will be summarized here. The Dow cargo of polyethylene resin was duly loaded on the OGDEN FRASER in Montreal. The vessel proceeded to New Orleans, where it was to pick up a total of 6,000 tons of steel belonging to Manuel and several other shippers. When the OGDEN FRASER arrived on January 24, 1979, behind schedule, some of the steel of the other shippers had been sent on other vessels, leaving less than their anticipated 3,500 tons to be carried by the OGDEN FRASER; some of Manuel's steel had been ice-bound on the Mississippi River and only 1,487 of its originally agreed 2,500 tons of steel were available to be loaded onto the vessel.
 
 
 5
 The OGDEN FRASER sailed from New Orleans on or about February 2, 1979, carrying the Dow resin and the steel of Manuel and the other shippers, ostensibly heading for Bombay. On February 1, however, Gulf Stream Navigation, a corporation owned by Sipra, had instructed the OGDEN FRASER to sail not to Bombay, but instead to Cadiz, Spain--a port at which it had not been scheduled to call--and to discharge the steel and resin cargoes in Cadiz and proceed to three ports in Italy to pick up several new cargoes, which it would then carry to Dubai, U.A.E., and to Kuwait.
 
 
 6
 The Manuel steel was shipped under 14 bills of lading, four of which had been issued to Manuel as "on board" bills in December 1978, prior to the arrival of the OGDEN FRASER, in order to allow Manuel to draw on a letter of credit that was soon to expire. Following the loading of its steel onto the vessel, Manuel tendered freight payment to Rascator through Intra-Span and requested the issuance of its remaining ten bills of lading. Rascator and Intra-Span rejected the tendered payment and refused to issue the remaining bills, apparently on the ground that the shipment by Manuel and the others of less steel than had originally been agreed had left Rascator with "deadfreight." Rascator commenced an action in the Southern District of New York, Rascator Maritime, S.A. v. Phillipps Overseas, Inc., 79 Civ. 0785 ("Rascator Suit"), seeking damages against, inter alios, Manuel and the other steel shippers for deadfreight and for the four prematurely issued bills of lading.
 
 
 7
 Shortly after the refusal to issue Manuel's ten bills of lading, Sipra and Galin sought to persuade Manuel's president and vice president to join with them in a plan to appropriate the steel cargo aboard the OGDEN FRASER belonging to Manuel and the other shippers and to sell it to buyers in Pakistan. Manuel's officials responded to this scheme by causing Manuel to commence its own action in the Southern District of New York, Manuel International, Inc. v. M/V OGDEN FRASER, 79 Civ. 0795, seeking relief against Rascator and the other defendants herein. The court, Gerard L. Goettel, Judge, ordered, without prejudice to Rascator's claims as asserted in the Rascator Suit, that the bills of lading be issued, and it enjoined the sale or disposition of Manuel's steel to anyone other than the proper consignees in Bombay. Pursuant to Judge Goettel's order, bills of lading were issued, signed "For Rascator Maritime S.A. By: Intra-Span Inc. as Agents." The defendants ignored, however, the injunction requiring the OGDEN FRASER to deliver the cargo only to its consignees in Bombay. Instead, the prior instruction to go to Cadiz was renewed, and the OGDEN FRASER proceeded to Cadiz, where it offloaded both Manuel's steel and Dow's resin.
 
 
 8
 In the Rascator Suit, Manuel obtained an order from the court, Richard Owen, Judge, holding Rascator in contempt of court for its repeated failures to comply with orders of the court, and requiring Rascator to transship Manuel's steel to Bombay. The order stated that if Rascator failed to transship or to pay the monetary fines imposed for the contempt, the Rascator Suit would be dismissed with prejudice. Notwithstanding Judge Owen's order, defendants did not arrange for the transshipment to Bombay; nor would they release the steel to Manuel until, eventually, Manuel obtained a new court order requiring its release.
 
 
 9
 Dow, which learned belatedly that its resin had been discharged in Cadiz, commenced the present action in June 1979 against Rascator, Intra-Span, Sipra, and Galin, and obtained an order requiring the defendants to release the resin offloaded in Cadiz so that Dow could transship it to Bombay. Dow later added Ogden, the OGDEN FRASER, Sanko, and Sanko Kisen as defendants to its action. Manuel brought a new action for damages against all of the defendants, and its action and Dow's were consolidated in July 1982 before Judge Duffy. In the consolidated actions, plaintiffs sought damages for defendants' failure to deliver the cargoes to Bombay and for damage to the cargoes while on board the OGDEN FRASER.
 
 B. The Judgments Below
 
 10
 As set forth in greater detail in Part II.A.1. below, in January 1981, a default was entered against Rascator in Dow's action for failure to comply with an earlier order of the court. A document entitled "DEFAULT JUDGMENT" was entered in the consolidated actions in December 1982, ordering an inquest on the matter of damages. A December 1983 motion by Rascator to set aside the December 1982 default was denied on the ground that "[t]he time to request that relief has long since passed."
 
 
 11
 In June 1984, Judge Duffy conducted a three-day bench trial, following which, in an opinion reported at 594 F.Supp. 1490 ("Opinion"), he found the OGDEN FRASER liable in rem for the deviation of the voyage to Cadiz. Finding that Rascator was a carrier within the meaning of COGSA, the court held Rascator also liable to the plaintiffs for their damages. The court ruled that Ogden, Sanko, and Sanko Kisen were not carriers within the meaning of COGSA and dismissed plaintiffs' claims against them. The court ruled that Ogden, which, as vessel owner, would bear the brunt of the in rem judgment against the OGDEN FRASER, was entitled to indemnification from Rascator, Intra-Span, Sipra, and Galin. In a subsequent Memorandum and Order reported at 609 F.Supp. 451 (1984) ("Amending Memorandum"), the court ruled, inter alia, that Ogden was entitled to indemnification from Sanko as well. It later ruled that Sanko was entitled to indemnification from Rascator, Intra-Span, Sipra, and Galin.
 
 
 12
 Characterizing Galin as a "pirate" and a "villain," 594 F.Supp. at 1492, and the schemes of Galin and Sipra as "iniquitous," "nefarious," and "larcenous," id. at 1499, 1495, 1494, the court found that Galin and Sipra had used the corporate forms of Rascator and Intra-Span for fraudulent purposes and that Galin had ignored Rascator's corporate form and treated the corporation as his alter ego. It ruled that Galin and Sipra should therefore be held personally liable to plaintiffs for damages and to Ogden and Sanko for indemnification. Finally, the court concluded that since the losses and legal expenses of plaintiffs, Ogden, and Sanko had been caused by the intentional and wanton acts of Galin and Sipra and the latters' callous indifference to the law, "simple fairness" demanded that Galin, Sipra, Rascator, and Intra-Span pay the attorneys' fees of plaintiffs, Ogden, and Sanko. Id. at 1492, 1500.
 
 
 13
 Judgments were entered accordingly, and these appeals followed, challenging the court's determinations as to the merits of plaintiffs' claims and its decision to award attorneys' fees.
 
 II. THE MERITS
 
 14
 Among the parties' challenges to the district court's determinations on the merits of plaintiffs' claims are (1) Rascator's contentions that there was no unreasonable deviation of the OGDEN FRASER and that the court should have vacated a default judgment entered against it; (2) Intra-Span's contention that it should not have been held liable because it acted solely as an agent for a disclosed principal; (3) Sipra's contention that there was no basis on which the court could hold him personally liable; and (4) Galin's contentions that he should have a new trial because his counsel had a conflict of interest or because the trial judge should have adjourned the trial or reopened the evidence so that Galin could testify in person, and that the court erred in piercing the corporate veil in order to find him personally liable. We have considered all of the parties' contentions as to the merits and conclude that only those listed above warrant discussion. We find none of them persuasive.
 
 A. Rascator's Contentions
 
 15
 Rascator has made four arguments on this appeal. The thrust of the first three is that Rascator should not have been found liable to the plaintiffs, principally because the trial judge erred in finding that the OGDEN FRASER had committed an impermissible deviation in its voyage. Rascator's last contention is that a default judgment in plaintiffs' favor was improperly entered against it. We consider Rascator's last argument first, for if a default judgment was validly entered against it and properly not vacated, Rascator would, in theory, have no standing to challenge on appeal the trial judge's findings with respect to its liability to the plaintiffs.
 
 1. The Default
 
 16
 Rascator asserts that a default judgment was entered against it in December 1982 in violation of Fed.R.Civ.P. 55(b)(2), which requires in certain circumstances that a defaulting party be given three days' notice prior to entry of a default judgment. Although the record below and the briefs on appeal bespeak considerable confusion as to what has occurred, our review of the record reveals that (1) no default judgment within the meaning of Rule 55 was entered against Rascator, (2) a "default" was entered against it which the court declined to set aside, and (3) the court does not appear to have refused, on the basis of the default, to consider the contentions advanced by Rascator.
 
 
 17
 In April 1980, Rascator's counsel, W. Shelby Coates, Jr., was permitted to withdraw from representing it in Dow's action, and Rascator was ordered to obtain new counsel by May 15, 1980. New counsel did not appear for Rascator for more than three years, however, and by December 1980 Dow had moved for the entry of a default on account of Rascator's noncompliance with the April 1980 order. Judge Duffy granted the motion in an endorsement dated January 6, 1981, which stated that "[a] default judgment will be entered against defendant Rascator Maritime S A for failure to comply with the April 6, 1980 order of this court. So ordered." The substance of this order was quoted in the district court docket entries. The record does not indicate that there were any further proceedings with respect to this default for nearly two years.
 
 
 18
 On December 9, 1982, in the by-then-consolidated actions, application was made, apparently by both plaintiffs, for the entry of a default judgment against Rascator on the basis of the January 1981 entry of default. The document submitted by plaintiffs to Judge Duffy for his signature was entitled "DEFAULT JUDGMENT"; it also referred to the January 6, 1981 order as a "Default Judgment." The decretal paragraphs (1) ordered that both plaintiffs recover damages and attorneys' fees from Rascator, (2) referred the matter to a United States Magistrate for an inquest, and (3) stated that after assessment at the inquest on damages "sustained by Plaintiff [sic ] ... the Court shall enter Judgment accordingly." Judge Duffy signed the so-called "DEFAULT JUDGMENT" and dated it December 10, 1982, and the clerk entered it on December 13, 1982. It does not appear that the inquest was ever held or that any final judgment as envisioned by the "DEFAULT JUDGMENT" was entered.
 
 
 19
 Rascator made no motion to disturb either of the defaults entered against it until December 1983, nearly a year after entry of the "DEFAULT JUDGMENT." Its motion in December 1983 was a cross-motion prompted by a motion by plaintiffs to sever the action against Rascator in light of Rascator's default. The cross-motion was in the form of an affidavit by Coates, who then was attorney of record only for Galin, and it asked the district court to vacate the December 1982 default judgment in "the interests of justice," stating that although counsel still had not appeared for Rascator as required by the April 1980 order, Rascator had in fact never been without counsel. The Rascator cross-motion referred the court to a May 1983 letter from Coates to the magistrate seeking to adjourn the required inquest on the basis that Rascator would move to undo the default on the ground that it had meritorious defenses to plaintiffs' claims. The district court denied the cross-motion to lift the default, stating that "[t]he time to request that relief has long since passed."
 
 
 20
 Rascator's 1985 notice of appeal to this Court from the final judgments entered in these actions listed the December 1982 "DEFAULT JUDGMENT" and the December 1983 refusal to lift that default among the orders of which review was sought. In its briefs on appeal, Rascator contends that the December 1982 "DEFAULT JUDGMENT" was improperly entered because, although Rule 55(b)(2) required that Rascator be given three days' notice prior to its entry, the document was submitted to the court on December 9 and signed by the court on December 10. We reject this argument because it misperceives the nature of the action taken by the court in December 1982 and the distinction made by Rule 55 between defaults and default judgments.
 
 
 21
 Rule 55(a) provides that a default may be entered by the clerk of the court when the clerk learns, through affidavit of a party or otherwise, that a party against whom a judgment for affirmative relief has been sought has failed to plead or otherwise defend as required by the rules. The default is entered by the placement of a notation of the party's default on the clerk's record of the case. The default notation is an interlocutory action; it is not itself a judgment. See Meehan v. Snow, 652 F.2d 274, 276 (2d Cir.1981); 6 Moore's Federal Practice p 55.03, , at 55-13 to 55-17 (1985).
 
 
 22
 Provision for the entry of judgment on the default is found in Rule 55(b), and Rule 55(b)(2) requires that, if the defaulting defendant has appeared in the action and the amount of damages demanded by the plaintiff is not a sum certain, the defendant "shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application." The "judgment" envisioned by Rule 55(b) is the final judgment in the case, not merely an interlocutory order designed to lead, after a hearing, to a final judgment. The judgment by default "involves final judicial action," 6 Moore's Federal Practice p 55.10, at 55-51 (emphasis added), and "is a final judgment for all purposes as between the parties and those in privity with them," id. p 55.09, at 55-46.
 
 
 23
 It is plain that the so-called "DEFAULT JUDGMENT" entered in December 1982 was not itself, and was not intended to be, a final judgment on the claims of plaintiffs against Rascator. That document expressly ordered that there be an inquest as to damages and indicated that only thereafter would a final judgment be entered. The "DEFAULT JUDGMENT," therefore, was in fact no more than another interlocutory entry of default. Rule 55(b)(2) did not require three days' notice prior to the entry of this document; it sufficed under the Rule that Rascator received notice of entry of this document at least three days before any scheduled inquest.
 
 
 24
 As the December 1982 "DEFAULT JUDGMENT" was merely an interlocutory order, both it and the December 1983 denial of Rascator's cross-motion, which likewise was interlocutory, are properly reviewable on this appeal from the final judgments. See, e.g., McLain Lines v. The Ann Marie Tracy, 176 F.2d 709, 711 (2d Cir.1949). In reviewing Rascator's arguments as to the merits of these decisions, we find no ground for reversal. There is no question that the default in favor of Dow was properly entered; Rascator had failed to comply with the court's April 1980 order, and it had not remedied that noncompliance by December 1982. While we are less clear as to the basis for the entry of default in favor of Manuel, in whose action Coates had not been permitted to withdraw from representing Rascator (see Part II.D.1. below), Rascator apparently has never asserted, here or below, that it was not in default in the Manuel action.
 
 
 25
 Rascator was entitled under Rule 55(c), of course, to move to set aside the default "[f]or good cause shown." Viewing the December 1983 cross-motion as such an application, we conclude that the default was properly allowed to stand, for at least two reasons. First, the district court found that the "time to request that relief ha[d] long since passed." Rule 55(c) sets forth no guidelines for determining within what period the defaulting party must move to set aside a default, but we think it plain that such a motion must be made within a reasonable time, see 6 Moore's Federal Practice p 55.10, at 55-52 to 55-53; id. p 55.10, at 55-59, and we see no abuse of discretion in the court's determination that the motion had not been made within a reasonable time. Rascator had known of the entry of the "DEFAULT JUDGMENT" at least seven months prior to making its cross-motion, for that is when it moved for an adjournment of the inquest, stating that it intended to challenge that default. Indeed, it presumably knew of the document within days of its entry, since the court's docket entries indicate that notice of the document was mailed to the parties by the Clerk's office.
 
 
 26
 More important, as to Dow the court could not properly have granted Rascator's December 1983 cross-motion to set aside the default because Rascator still had not caused new counsel to appear for it. As a corporation, Rascator could not be permitted to conduct litigation unless it was represented in the actions by counsel. Jones v. Niagara Frontier Transportation Authority, 722 F.2d 20, 22 (2d Cir.1983); Shapiro Bernstein & Co. v. Continental Record Co., 386 F.2d 426 (2d Cir.1967) (reversing district court's refusal to grant a default judgment where corporate defendant had not complied for one year with district court's order to secure new counsel after withdrawal of its original counsel).
 
 
 27
 In sum, Rascator has shown no basis for reversal of either the December 1982 entry of default or the December 1983 refusal to set that default aside. In principle, therefore, after December 1982 Rascator had no standing to participate in the further adjudication of issues as to its liability to plaintiffs. See 6 Moore's Federal Practice p 55.03. In fact, however, it does not appear that the default entered against Rascator was given the anticipated effect.
 
 
 28
 No inquest was held, and hence no judgment pursuant to an inquest was entered. Prior to trial, Coates apparently put in a formal appearance as counsel for Rascator although, as the following colloquy between counsel and the court reveals, the default was not set aside:
 
 
 29
 MR. HAYDEN [counsel for plaintiffs]: ...
 
 
 30
 ... [W]e believe that [Rascator has] been defaulted and severed from this case and they are not entitled to be putting any documents or any evidence before the court ....
 
 
 31
 ....
 
 
 32
 MR. COATES: There was a judgment, default judgment taken against Rascator. However, I contend that the pretrial order permitted Rascator to go forward with its cross-claims, affirmative cross-claims against other codefendants and in particular Sanko....
 
 
 33
 ....
 
 
 34
 THE COURT: ...
 
 
 35
 ... I have a problem ... as to whether you get a right to come in for Rascator one way or the other. Maybe the guys from Sanko might have the answer.
 
 
 36
 MR. CURTIN [counsel for Sanko]: I didn't know there was a cross-claim against us, your Honor, and if there was a cross-claim I can't find it in the pleadings....
 
 
 37
 ....
 
 
 38
 THE COURT: I will take a look at it. This then would not affect the plaintiff [sic ] one way or the other.
 
 
 39
 MR. HAYDEN: I presume that we have our default against Rascator and that stands.
 
 
 40
 THE COURT: No one has said it doesn't.
 
 
 41
 (Trial Transcript dated June 26, 1984, at 13-16.)
 
 
 42
 Nonetheless, this view apparently did not keep the court from addressing the merits of the contentions advanced by Rascator at and after trial. The final judgment entered in favor of plaintiffs against Rascator, et al., does not refer to any default by Rascator; rather it recites that judgment was being entered following a trial held before Judge Duffy and on the basis of the decisions made by Judge Duffy as reflected in the Opinion, 594 F.Supp. 1490, and in the Amending Memorandum, 609 F.Supp. 451. Neither the Opinion nor the Amending Memorandum makes reference to any default by Rascator in the present action. Rather, the court apparently was under the impression that the defaults against Rascator had been entered in the Rascator Suit on account of its violations of the orders of Judges Goettel and Owen to carry the cargoes to Bombay, rather than in the present actions for failure to comply with Judge Duffy's order to obtain counsel. (See 594 F.Supp. at 1495 ("On January 6, 1981, a default judgment was entered against Rascator in its action for deadfreight for failure to comply with the court's order. Final default was entered against Rascator on December 10, 1982.") (emphasis added); 609 F.Supp. at 453 ("[A] default judgment was entered against Rascator for failure to comply with orders issued by Judge Owen and Judge Goettel.") (emphasis added). In fact, notwithstanding Rascator's failures to comply with the orders of Judges Owen and Goettel, the Rascator Suit was not dismissed but was placed on the court's suspense docket.)
 
 
 43
 Far from indicating that Rascator had been barred in the present actions from presenting its contentions in defense of plaintiffs' claims, the opinions of Judge Duffy indicate that those contentions were in fact entertained. In its principal opinion, for example, the court expressly rejected Rascator's assertion that the plaintiffs had tortiously interfered with the carriage contracts. 594 F.Supp. at 1497. And in its Amending Memorandum, the court noted that Rascator and Galin had moved to amend the Opinion to delete, inter alia, the statement that the four bills of lading issued to Manuel prematurely had been issued by Rascator, and the court so amended the Opinion. 609 F.Supp. at 453-54.
 
 
 44
 Thus, notwithstanding the default, the court seems to have considered Rascator's contentions with respect to plaintiffs' claims and to have rejected those contentions on their merits. Accordingly, although we have concluded that the default was properly not vacated, we will entertain on this appeal Rascator's challenges to the district court's decisions on the merits of plaintiffs' claims against it.
 
 2. The Merits
 
 45
 Rascator challenges the trial court's determination that the OGDEN FRASER and Rascator are liable to plaintiffs for an impermissible deviation of the vessel to Cadiz, contending principally that the deviation was reasonable because its purpose was to permit Rascator to assert a lien against the vessel's cargo and that the deviation was justified by the doctrine of commercial impracticability. These contentions have no merit.
 
 Section 4(4) of COGSA provides as follows:
 
 46
 Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: Provided, however, That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.
 
 
 47
 46 U.S.C. Sec. 1304(4) (1982). It is undisputed that the deviation to Cadiz was unrelated to any attempt to save life or property at sea. It is indisputable that the purpose of the vessel's going to Cadiz was to permit it to unload plaintiffs' cargoes--a purpose made prima facie unreasonable by COGSA. Rascator contends that the prima facie unreasonableness of the deviation was overcome by the fact that the purpose of the planned unloading was to permit Rascator to assert a lien on the cargoes. Even assuming that an intended assertion of a lien on cargoes were a purpose that might ordinarily make a deviation "reasonable" within the meaning of COGSA, but see United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833, 836 (S.D.N.Y.1965) (deviation solely for business reasons is unreasonable), we would reject Rascator's appeal, for two reasons.
 
 
 48
 First, Judge Goettel had enjoined defendants from disposing of the steel cargo other than by delivering it to its consignees in Bombay. The trial judge obviously was entitled to consider that a deviation for the purpose of asserting a lien in contempt of a court order was not reasonable.
 
 
 49
 Second, Judge Duffy discredited even the factual contention that the underlying purpose of the deviation was the assertion of a lawful lien, inferring that the deviation was instead for a "larcenous" purpose. An inference that is simply a choice between two plausible views of the evidence cannot be considered "clearly erroneous," Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, N.C., --- U.S. ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949), and here the court's inferences were amply supported by the record. As to the Dow resin, no basis whatever was shown for the assertion of a lawful lien; the freight for this cargo had been fully prepaid. As to the steel cargoes, if a right to a lien resulted from the failure of the shippers to have available for carriage the originally anticipated 6,000 tons, that failure was known before the vessel left New Orleans, and a lien could have been asserted in New Orleans. Even were no dishonest motive evident, the court could consider the taking of the steel from New Orleans to an unscheduled port in order to dump it there (and the dumping was part of the pre-departure instructions to the OGDEN FRASER), to be unreasonable. The court's view that the cargoes were taken to Cadiz as part of a plan that was in fact larcenous was supported by the testimony of Manuel's president that Galin and Sipra had expressly proposed to appropriate the steel and sell it for their own benefit. The trial court found this testimony credible, and we see no basis on which to upset its assessment.
 
 
 50
 In sum, since COGSA provides that a deviation for the purpose of unloading cargo is prima facie unreasonable, and since a contemptuous or larcenous purpose is ipso facto unreasonable, the court properly held that the deviation to Cadiz violated COGSA and breached the carriage contracts.
 
 
 51
 We find no greater merit in Rascator's contention that the deviation was excusable under the doctrine of commercial impracticability. That doctrine generally may be invoked to excuse a party from performing a contract " 'if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made.' " Asphalt International, Inc. v. Enterprise Shipping Corp., S.A., 667 F.2d 261, 266 n. 4 (2d Cir.1981) (quoting U.C.C. Sec. 2-615(a)); see American Trading & Production Corp. v. Shell International Marine Ltd., 453 F.2d 939, 942 (2d Cir.1972) ("American law recognizes that performance is rendered impossible if it can only be accomplished with extreme and unreasonable difficulty, expense, injury or loss."); see generally Restatement (Second) of Contracts Sec. 261 and Introductory Note thereto (1981). Rascator contends that carriage of plaintiffs' cargoes beyond Cadiz was commercially infeasible for it because it had not received sufficient freight payments from the steel shippers to make the voyage to Bombay profitable. Even if this were so, it would not, in the circumstances, make the doctrine of commercial impracticability applicable to defeat plaintiffs' claims.
 
 
 52
 First, there is no evidence that the contracts of carriage were premised on the OGDEN FRASER's being fully loaded for the voyage to Bombay. In the absence of such a basic assumption on the part of both parties, the doctrine is inapplicable.
 
 
 53
 Second, the doctrine is an equitable principle designed to excuse a party's innocent nonperformance, not to exonerate him for malfeasance. Here, the cargo shortage was known to the carrier before it left New Orleans. If, in fact, the OGDEN FRASER could not, without undue hardship, make the voyage to Bombay because of that shortage, the most the doctrine would do would be to excuse the carrier from carrying the goods from New Orleans; it could not justify its taking the cargoes away to an unscheduled port in order to hold them for, as the trial court characterized it, "ransom," 594 F.Supp. at 1494.
 
 
 54
 In sum, the trial court viewed the actions and intent of Rascator, Galin, and Sipra with regard to the cargo of the OGDEN FRASER as "iniquitious" and "larcenous." Since the evidence supported this view, the doctrine of commercial impracticability, which is designed to do justice, could not be invoked to aid Rascator.
 
 
 55
 B. Intra-Span as Agent for a Disclosed Principal
 
 
 56
 Intra-Span challenges the ruling that it is liable to plaintiffs for damages and to Ogden and Sanko for indemnification principally on the factual premise that it signed contracts relating to the OGDEN FRASER only as agent for Rascator and on the doctrinal premise that an agent for a disclosed principal is not liable for breach of the contract unless the parties to the contract have clearly manifested an intention to bind the agent instead of or in addition to his principal. We agree that the doctrine is applicable to admiralty cases in general, see, e.g., Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855, 860 (2d Cir.1985); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 808 (2d Cir.1971), but we find it inapplicable to Intra-Span since the factual premise was apparently rejected by the trial court. While the parties' pretrial stipulation agreed that Intra-Span "at all relevant times acted as a steamship agent for RASCATOR MARITIME S.A.," there was apparently no agreement that Intra-Span acted solely as Rascator's agent, and the court took the view that Intra-Span was acting in pertinent part on its own behalf as a principal and on behalf of Sipra, its owner, as a principal, rather than solely as an agent for Rascator.
 
 
 57
 While the findings of the trial court as to the nature of Intra-Span's role are somewhat sketchy, the court stated that although Intra-Span was "assertedly" agent for Rascator, 594 F.Supp. at 1492, it was in fact used for fraudulent purposes by Sipra, id. at 1498-99. It found that after the OGDEN FRASER had sailed from New Orleans, Manuel tendered freight payment to Sipra, who, the record indicates, was wearing his Intra-Span hat; the tendered payment was rejected and the requested bills of lading were refused, actions that the court characterized as holding the cargo for "ransom." This was followed shortly by Sipra's proposal to Manuel Feingold and Anne O'Brien, Manuel's president and vice president, respectively, that they join with Sipra and Galin to appropriate the steel cargo on board the OGDEN FRASER, sell it, and share the proceeds. Feingold testified that Galin confirmed that "it would be a joint venture of Sipra and Galin and Anne and [Feingold]."
 
 
 58
 The trial court found Feingold's testimony "totally credible," id. at 1499, and it concluded that "there is no question that [plaintiffs' cargo] was offloaded at the Port of Cadiz for nefarious reasons of the defendants Rascator, Dr. Galin and Sipra," id. at 1495 (emphasis added). The court's inference that Sipra had his own personal stake in diverting plaintiffs' cargo from its intended destination was further supported by evidence that Sipra had proposed the OGDEN FRASER venture to Galin in order to enable Sipra to pay a $450,000 debt to Galin. See Part II.D.3. below. Thus, the court's inference that Sipra's role was that of a principal and its finding that Sipra used Intra-Span for a fraudulent purpose amount to a finding that Intra-Span was not simply an agent for Rascator but that Intra-Span and Sipra were in fact undisclosed principals of Rascator. On this basis, the court was justified in concluding that Intra-Span itself was liable. See Restatement (Second) of Agency Sec. 189, comment d (1958) ("If a purported agent, although acting for himself, is authorized to represent that he is agent for a particular person and it is agreed that the contract is with such person, the purported agent is subject to liability upon the contract as an undisclosed principal of such person.").
 
 C. Sipra's Liability
 
 59
 Sipra contends that there was no basis on which the trial court could properly hold him personally liable to plaintiffs, Ogden, and Sanko. We conclude that the judgment against Sipra should be upheld on the same basis on which we uphold the judgment against Intra-Span. As detailed in the preceding section, the court inferred that Sipra had a personal stake in the activities of Rascator, as evidenced by his initiation of the OGDEN FRASER venture in order to pay his sizeable debt to Galin and his proposal for theft of the steel cargoes for his own benefit. Thus, Sipra, though he purported to act on behalf of Intra-Span and Rascator, was found to have been acting for himself, and he was thus liable as an undisclosed principal of Rascator. Restatement (Second) of Agency Sec. 189, comment d.
 
 D. Galin's Contentions
 
 60
 Galin raises several procedural and substantive arguments in his attack on the trial court's determination on the merits. He argues principally that he is entitled to a new trial because his attorney had a conflict of interest, that the court should either have adjourned the trial or reopened the evidence following trial to allow him to testify in person, and that the court erred in piercing the corporate veil to find him personally liable. We find no merit in any of his contentions.
 
 
 61
 1. The Asserted Conflict of Galin's Attorney
 
 
 62
 Galin's first contention is that Coates, who represented Galin and Rascator, had an irreconcilable conflict of interest because of his prior representation of Sipra and his possible role as a fact witness with respect to advice he had given Galin. Galin contends that he is entitled to a new trial because the court and the attorneys for the other parties had an obligation to ensure that he had a trial conducted by a conflict-free attorney. We find in this contention no ground for reversal.
 
 
 63
 First, as nearly as we can determine, Galin made no such contention or request for relief in the district court. Although obviously Coates himself could not be expected to make such arguments, Galin at some point obtained new counsel, who represent him on this appeal. There is no indication that, through his new attorneys, Galin presented these arguments to the district court in, for example, a motion to vacate the judgments pursuant to Fed.R.Civ.P. 60(b). A civil litigant who would assert on appeal the argument that he is entitled to a new trial because he was denied conflict-free counsel has an obligation to present that argument in a timely manner to the district court in the first instance. We need not consider it when it is raised for the first time on appeal.
 
 
 64
 In any event, Galin's contention that the court or the other attorneys had an obligation to do more than had already been done to call Coates's possible conflict to Galin's attention is frivolous. The record indicates that in the Dow action Coates had initially appeared as attorney of record for Rascator, Intra-Span, Sipra, and Galin. Coates applied for permission to withdraw from the action, stating that Galin and Sipra had had a falling out and it would be imprudent for Coates to attempt to represent any of the parties. Galin was sent copies of the application and was notified of it personally. The motion was granted, and new attorneys appeared for Galin and for Sipra and Intra-Span.
 
 
 65
 In the Manuel action, Coates originally represented only Galin and Rascator, and when he moved to withdraw from representing them in that action, his motion was denied because Galin and Rascator had not consented. Plainly, Galin could have been relieved of Coates's services simply by consenting to the withdrawal motion. Equally plainly Galin had full knowledge of the potential conflict: He knew what Coates's role had been in advising him with regard to the events at issue; he knew, according to his deposition testimony, that in the past when litigation had arisen between himself and Sipra, Coates had had to withdraw; and he knew from the withdrawal applications that Coates thought there was a potential for conflict in these cases. Not only, however, did Galin refuse his consent for Coates's withdrawal in the Manuel action; in July 1972 Galin moved to reinstate Coates as his attorney in the Dow action. In the circumstances, Galin was entitled, so long as Sipra and Intra-Span as former clients with possibly conflicting interests did not object, see In re Yarn Processing Patent Validity Litigation, 530 F.2d 83, 88 (5th Cir.1976), to ignore the potential conflict and proceed with counsel of his choice. He cannot be heard to complain of that choice now.
 
 
 66
 The authorities relied on by Galin are inapposite since they involve cases of continuing multiple representation in the litigation, where conflicting strategies might have been pursued at trial on behalf of clients represented by the same attorney. In such circumstances the court has an obligation to ensure that the clients involved are aware of the risks. See, e.g., Dunton v. County of Suffolk, 729 F.2d 903, 908-09, amended on other grounds, 748 F.2d 69 (2d Cir.1984). The court is not required, however, to inquire sua sponte into present counsel's past attorney-client relationships to determine whether an attorney of record can adequately represent the client for whom he appears in the instant litigation.
 
 
 67
 In sum, we find no merit whatever in Galin's "conflict" contentions.
 
 
 68
 2. The Motions to Adjourn and Reopen the Trial
 
 
 69
 Galin contends that the district court abused its discretion both in denying his motion for a one-week adjournment of the start of the trial, and in refusing to reopen the trial for purposes of hearing Galin's live testimony. Both contentions are meritless.
 
 
 70
 A motion to adjourn the scheduled start of a trial is addressed to the trial judge's sound discretion, Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964); Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940), and will not be disturbed unless clear abuse is shown, United States v. Cicale, 691 F.2d 95, 106 (2d Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). To show abuse, the party must establish both that the denial of the adjournment was arbitrary and that it substantially impaired the presentation of his case. United States v. Bein, 728 F.2d 107, 114 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 135, 83 L.Ed.2d 75 (1984).
 
 
 71
 The district court's action was not arbitrary. Galin received some two weeks' notice that the trial was to commence on June 25, 1984; it eventually commenced on June 26. In seeking an adjournment, Galin submitted no motion in writing to the court, nor any affidavit or other evidence to support a claim of compelling obligations that would prevent his attendance at trial. Instead, his counsel simply stated at a pretrial conference that Galin had some commitments in Europe during the time for which trial was scheduled. Given the vagueness of the application, the denial could not have been an abuse of discretion.
 
 
 72
 A motion to reopen the record for the presentation of new evidence is likewise addressed to the sound discretion of the court, Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 342 (2d Cir.1983); 6A Moore's Federal Practice p 59.04, at 59-31 to 59-32, and we similarly see no abuse of discretion here in the district court's denial of this motion. In support of his motion to reopen, Galin submitted an affidavit that revealed clearly that there had been no compelling reason for him not to attend at least the commencement of trial. As to his commitments for the dates in question, Galin's affidavit stated only that he had been scheduled to speak at an ophthalmology conference in California from June 28-30, to attend a conference in London from July 2-4, and to see patients in France sometime in late June or early July. Galin apparently had no conflicting engagements from June 25-27, and his nonattendance at the start of trial can be laid at no other door than his. Indeed, having learned prior to trial that Galin might not attend, plaintiffs served Galin with a trial subpoena to secure his presence. Galin ignored the subpoena.
 
 
 73
 Finally, Galin's affidavit stated that after he learned that trial would commence on June 26, he in good faith decided not to attend the beginning of trial because he believed the trial would last five days (i.e., presumably through July 2) and that he could attend its final days, and that he was prevented from doing so because, contrary to expectations, the trial lasted only three days, not five. Any suggestion of bona fides on the part of Galin, however, is belied by the details of the affidavit itself. Not only did Galin advance no reason why he could not attend trial on June 26 and 27; but his statement that he had committed himself to be in London from July 2-4 was inconsistent with his suggestion that he believed he would have returned to New York in time to testify before the trial's anticipated end on July 2.
 
 3. The Corporate Veil
 
 74
 Finally, Galin contends that the court erred in holding him personally liable, arguing that the court's decision to pierce Rascator's corporate veil to hold him liable in effect "makes a principal of a corporation liable for any wrongful act of the corporation." As the district court correctly stated,
 
 
 75
 [t]he test for piercing the corporate veil in a maritime context was enunciated in Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir.1980). The individual must have used the corporate entity to "perpetrate a fraud or have so dominated and disregarded" the corporate entity's form that the entity "primarily transacted [the individual's] personal business rather than its own corporate business." Id.
 
 
 76
 594 F.Supp. at 1498; see Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir.1979); Interocean Shipping Co. v. National Shipping and Trading Corp., 523 F.2d 527, 539 (2d Cir.1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); see also Weisser v. Mursam Shoe Corp., 127 F.2d 344, 345 (2d Cir.1942). The court pierced the veil between Galin and Rascator because it found that Galin both treated Rascator as his alter ego and used the corporation for fraudulent purposes. We conclude that these findings are supported by the record.
 
 
 77
 In the fall of 1978, Sipra owed Galin some $450,000 on account of the defaults of Sipra and one of his companies on a note guaranteed by Galin. The venture with the OGDEN FRASER was designed to raise funds so that Sipra could repay his debt to Galin. Rascator, which had been incorporated earlier in 1978 with Sipra's cousin, Wajid Mirza, as president, and Sipra's assistant as its secretary, appears to have been essentially a shell corporation. It is not clear by whom its stock was owned. The corporation maintained no records of any meetings, or of the issuance of stock, or of election of directors. It is unclear whether it ever had any employees. Its sole asset was a bank account at Sterling National Bank ("Sterling"), opened in September 1978 with approximately $483,000 that came from Galin. Galin was the only person with signature authority for the Rascator account. In October 1978, Mirza authorized Sterling "to utilize all funds directed to Rascator Maritime S.A. for the account of Myles [sic ] A. Galin, M.D. Any funds deposited to Rascator Maritime S.A. can be transferred to Myles [sic ] A. Galin, M.D." All statements as to the Rascator account were sent to Rascator in care of Galin at Galin's home address. Galin guaranteed all loans by Sterling to Rascator. He was responsible for overdrafts on the Rascator account. Funds were consistently shuttled between Galin's personal accounts and the Rascator account. Galin testified at his deposition that he viewed the Rascator account as his own.
 
 
 78
 Further, while Galin claimed to be nothing more than a creditor of Rascator, the court found that Galin had signed the checks for Rascator's charter hire payments to Sanko, had played an active role in making the cargo booking arrangements for the OGDEN FRASER, had caused deviations in the ship's scheduled route, and had visited the ship; that it was Galin who later refused to agree to an extension of Rascator's letter of credit securing the sub-time charter from Sanko and caused Rascator to refuse to make charter hire payments to Sanko; and that after Judge Goettel's order was entered forbidding delivery of Manuel's cargo to anyone other than the consignees in Bombay, it was Galin who ordered the vessel to proceed to Cadiz and to unload plaintiffs' cargoes there.
 
 
 79
 All of these findings were supported by evidence in the record and cannot be regarded as clearly erroneous. The court's conclusions that Galin had treated Rascator as his alter ego and had "totally ignored Rascator's corporate form," 594 F.Supp. at 1499, were justified.
 
 
 80
 There was also evidence to support the finding that Galin used Rascator "to a fraudulent end." Id. at 1498. Rascator had held itself out as having a vessel that would carry freight to Bombay, and it had accepted cargoes and freight payments on that basis. In fact, however, before the OGDEN FRASER even set sail from New Orleans, Rascator, through one of Sipra's corporations, had ordered the OGDEN FRASER to go instead to Cadiz and dump plaintiffs' cargoes there, saving the vessel some 5,000 miles of promised--and prepaid--carriage. The instruction to go to Cadiz was accompanied by a detailed order to proceed to the Italian ports of Savona, Brindisi, and Catania, and to pick up specified cargoes there destined for Kuwait and Dubai. The instructions as to the arrangements that had been made were sufficiently detailed that it is reasonable to infer that the dumping of the cargoes in Cadiz had been planned in advance of the steel's being loaded onto the vessel. Thus, the fair inference was that Rascator accepted at least the steel cargoes under false pretenses. And, as described in greater detail in Parts I.A. and II.B. above, once Rascator had gained possession of the steel cargoes, Galin and Sipra sought to hold up Manuel for greater freight payments than had been agreed by withholding bills of lading covering its cargo, and then sought to coopt Manuel's officers into a scheme to steal all the steel cargoes and divide the proceeds of the sale among the individuals.
 
 
 81
 In all, we conclude that the court's decision to pierce the corporate veil between Rascator and Galin was not error.III. ATTORNEYS' FEES
 
 
 82
 Finally, we turn to the court's award of attorneys' fees to plaintiffs, Ogden, and Sanko from Rascator, Intra-Span, Sipra, and Galin, on grounds of bad faith. While the "American Rule" is that the prevailing party in federal court litigation generally cannot recover attorneys' fees, Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975), the court does have the power to award attorneys' fees to a successful litigant when his opponent has commenced or conducted an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (footnote omitted); Weinberger v. Kendrick, 698 F.2d 61, 80 (2d Cir.1982). To ensure, however, that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both " 'clear evidence' that the challenged actions 'are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes,' " Weinberger v. Kendrick, 698 F.2d at 80 (quoting Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir.1980)), and "a high degree of specificity in the factual findings of [the] lower courts." Weinberger v. Kendrick, 698 F.2d at 80; see Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078, 1089 (2d Cir.1977). Whether a claim is colorable, for purposes of the bad-faith exception, is a matter of "whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." Nemeroff v. Abelson, 620 F.2d at 348 (emphasis in original). Finally, we have noted that "[b]ad faith is personal." Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d at 1089. There must be clear evidence of bad faith by a particular party before attorneys' fees may be assessed against him. A finding that one defendant has acted in bad faith in conducting litigation does not justify an award of fees against a codefendant.
 
 
 83
 The district court's findings do not meet these standards. In awarding fees against Rascator, Intra-Span, Sipra, and Galin, the court stated as follows:
 
 
 84
 As I have stated, the intentional and wanton acts of Dr. Galin and Sipra caused plaintiffs' financial losses as well as the legal expenses incurred by their co-defendants. The callous indifference to the law exhibited by Dr. Galin and Sipra from the inception of these actions in 1979 to the day of trial is only one example of their bad faith. Justice in this case will not be served absent an award of attorneys [sic ] fees to plaintiffs, Sanko, and Ogden who were the target of and/or innocent bystanders to the scheme perpetrated by Dr. Galin and Sipra.
 
 
 85
 594 F.Supp. at 1500. This rationale states at once too much and too little.
 
 
 86
 First, it is apparent that the court relied on factors other than those pertinent to the application of the bad-faith exception. Although the court indicated that Galin and Sipra had shown indifference to the law throughout the pretrial period in the present litigation, its statement that this indifference was "only one" example of their bad faith suggests that the court relied on a number of matters other than the conduct of the present litigation. The finding that "intentional and wanton acts" caused plaintiffs' losses and thereby put innocent parties to substantial legal expense, and the view that justice therefore could not be served absent an award of attorneys' fees, are no more than a "restate[ment of] one of the oft-repeated criticisms of the American Rule." F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. at 128, 94 S.Ct. at 2164. Under the American Rule, the view that the party's business conduct was "larcenous" or "nefarious" or "villain[ous]" or even "[o]ld fashioned piracy" does not entitle the court to award attorneys' fees.
 
 
 87
 The appropriate focus for the court in applying the bad-faith exception to the American Rule is the conduct of the party in instigating or maintaining the litigation, for an assessment of whether there has been substantive bad faith as exhibited by, for example, its pursuit of frivolous contentions, or procedural bad faith as exhibited by, for example, its use of oppressive tactics or its willful violations of court orders. We think it appropriate to note, moreover, that the litigation to be focused on is the same litigation in which the fee award is under consideration. In an earlier part of its opinion the court stated that
 
 
 88
 [i]f the orders of this court had been complied with the damages suffered by the parties would have been negligible. The callous disregard of appropriate and lawful court orders has escalated a minor problem into a major case. The evidence shows that the person mainly responsible for these contemptuous decisions was Miles A. Galin.
 
 
 89
 594 F.Supp. at 1495. This comment appears to focus on defendants' violations of the orders of Judges Goettel and Owen in the two lawsuits that preceded this one. Violations of orders in other litigation should not be the basis for an award of fees in the instant litigation; such violations are best dealt with in the actions in which they have occurred.
 
 
 90
 Insofar as the district court did focus on the conduct of the present litigation, its findings are too meager to support the award. The court's statement of its grounds for making the award did not even mention two of the parties against whom the award was made, i.e., Rascator and Intra-Span. Findings with regard to other defendants cannot, without more, provide grounds for affirmance of an award against these two parties. As to the two parties who were mentioned, Galin and Sipra, the court merely referred to a "callous indifference to the law ... from the inception of these actions in 1979 to the day of trial" without identifying any particular act or omission that it thought gave the required clear evidence of their bad faith conduct of the litigation. This statement does not contain the "high degree of specificity in the factual findings" that this Court requires in order to sustain an award of attorneys' fees under the bad-faith exception. We are aware, of course, see Parts II.A.1. and II.D.2. above, of two instances of default in the action, i.e., Rascator's prolonged failure to comply with a court order to obtain counsel in the Dow action, and Galin's failure to comply with a trial subpoena, but it is difficult to believe, to the extent that the court thought that a party's litigation conduct alone warranted an award of fees, that it had in mind only these incidents. We doubt, for example, that the fact that a defendant defaulted against one plaintiff in May 1980 would be thought to justify an award against it for the fees incurred by plaintiffs in pursuing other defendants for the next four years.
 
 
 91
 In light of the court's evident reliance on extraneous factors in making the fee award and its failure to make adequate findings as to pertinent factors, we vacate the award of attorneys' fees and remand the matter for further proceedings. On remand, the court should make clear and specific findings as to any defendant against whom an award is to be made. It may also consider other bases for the award of attorneys' fees, such as any contractual rights Ogden or Sanko may have in connection with its right of indemnification. See Nichimen Co. v. M.V. Farland, 462 F.2d 319, 333-34 (2d Cir.1972); David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295, 300 (2d Cir.1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965).
 
 CONCLUSION
 
 92
 The judgments appealed from are affirmed except to the extent that they award to plaintiffs, Ogden, and Sanko attorneys' fees from Rascator, Intra-Span, Sipra, and Galin. The award of attorneys' fees is vacated and the matter is remanded for further proceedings not inconsistent with this opinion. Costs to appellees.